DANIEL H. REISS (CA SBN 150573) (admitted pro hac vice)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234; Facsimile: (310) 229-1244
Email: dhr@lnbyg.com

*Counsel for Creditor Kitsch LLC*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Deejayzoo LLC<br>d/b/a Shhhowercap,<br><div align="right">Debtor.</div> | Chapter 11<br><br>Case No. 1-25-42617-nhl |

**OBJECTION BY KITSCH LLC TO DISCLOSURE STATEMENT**
**FOR THE DEBTOR'S PLAN OF REORGANIZATION**
**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

# TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................................. 1

II. THE DISCLOSURE STATEMENT FALLS FAR SHORT OF PROVIDING ADEQUATE
INFORMATION UNDER 11 U.S.C. § 1125 AND SHOULD NOT BE APPROVED ................ 3

   A.   Overall Legal Standard. ....................................................................................... 3

   B.   In Addition to a Lack of Adequate Disclosure of Basic Financial Information, the
Financial Information Disclosed is Incomplete, False and/or Fabricated.................................. 4

   C.   The Disclosure Statement Does Not Adequately Describe Potential Avoidance Claims,
and Why the Debtor Believes None Exist. ............................................................................ 10

   D.   The Disclosure Statement Does Not Adequately Describe Compensation to Be Paid to
Post-Confirmation Management. ...........................................................................................11

   E.   Debtor's Plan is Fatally Flawed and not Confirmable on its Face; Therefore, the
Disclosure Statement Should not be Approved ...................................................................... 12

   F.   The Disclosure Statement Does Not Provide Adequate Information With Respect to the
"Best Interests" Test of § 1129(a)(7). ................................................................................... 15

   G.   Debtor Fails to Disclose the Risks Posed to Creditors under the Plan. ........................ 17

   H.   The Plan Has Not Been Proposed in Good Faith; Therefore, the Disclosure Statement
Should not be Approved. ...................................................................................................... 18

III. CONCLUSION. ........................................................................................................... 20

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Bank of America National Trust and Savings Association v. 203 LaSalle Street
Partnership*,
119 S. Ct. 1411, 119 S.Ct. 1411 (1999) .....................................................12, 13, 14

*In re Bjolmes Realty Trust*,
134 B.R. 1000 (Bankr. D. Mass. 1991) ..............................................................4

In re Bonner Mall Partnership,
2 F.3d 899 (9th Cir.1993), *mot. to vacate denied and cert. dismissed,* 513 U.S.
18, 115 S. Ct. 386, 130 L.Ed.2d 233 (1994) .........................................................13

*Burtch v. Ganz* (*In re Mushroom Transp. Co.*),
382 F. 3d 325 (3rd Cir. 2004) ..........................................................................14

*In re Civatella*,
15 B.R. 206 (Bankr. E.D. Pa. 1981) ..................................................................3

*In re Crowers McCall Pattern, Inc.*,
120 B.R. 279 (Bankr. S.D.N.Y. 1990) ...............................................................16

*Official Committee ex rel. Cybergenics v. Chinery*,
330 F. 3d 548 (3d Cir. 2003)(en banc) ..............................................................14

*In re Dakota Rail, Inc.*,
104 B.R. 138 (Bankr. D. Minn. 1989) ................................................................3

*In re Drexel Burnham Lambert Grp., Inc.*,
138 B.R. 723 (Bankr. S.D.N.Y. 1992) ...............................................................16

*In re East Redley Corporation*,
16 B.R. 429 (Bankr. E.D. Pa. 1982) ..................................................................3

*In re Eastern Maine Electric Cooperative, Inc.*,
125 B.R. 329 (Bankr. D. Maine 1991) ...............................................................4

*In re Ferretti*,
128 B.R. 16 (Bankr. D.N.H. 1991) .....................................................................4

*In re Genessee Cement, Inc.*,
31 B.R. 442,444 (Bankr. E.D. Mich. 1982) ...................................................4, 17

*In re GSC, Inc.*,
453 B.R. 132 (Bankr. S.D.N.Y. 2011) ..............................................................15

*In re Jennifer Convertibles, Inc.*,
447 B.R. 713 (Bankr. S.D.N.Y. 2011) ................................................................15

*In re Jeppson*,
66 B.R. 269 (Bankr. D. Utah 1986) ......................................................................3

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corporation*,
337 F. 3d 314 (3d Cir. 2003) .......................................................................10, 11

*In re Leslie Fay Cos., Inc.*,
207 B.R. 764 (Bankr. S.D.N.Y. 1997) ................................................................16

*In re Ligon*,
50 B.R. 127 (Bankr. N.D. Tenn. 1985) .................................................................3

*In re Marvel Entertainment Group, Inc.*,
140 F. 3d 463 (3d Cir. 1998) ..............................................................................14

*In re Metrocraft Public Service Inc.*,
39 B.R. 567 (Bankr. N.D. Ga 1984) .....................................................3, 4, 8, 17

*In re Monroe Well Servs., Inc.*,
80 B.R. 324 (Bankr. E.D.Pa.1987) ......................................................................4

*In re Reilly*,
71 B.R. 132 (Bankr. D. Mont.1987) .....................................................................4

*In re Scioto Valley Mortgage Co.*,
88 B.R. 168 (Bankr. S.D. Ohio 1988) ..................................................................4

*In re Stanley Hotel, Inc.*,
13 B.R. 926 (Bankr. D. Colo. 1991) ...............................................................4, 17

*In re U.S. Brass Corp.*,
194 B.R. 420 (Bankr. E.D. Tex. 1996) .................................................................4

*In re Washington Mutual, Inc.*,
461 B.R. 200 (Bankr. D. Del. 2011) ...................................................................18

Kitsch LLC ("Kitsch"), a creditor in the above-referenced case, hereby files this objection (the "Objection") to the Disclosure Statement for The Debtor's Plan of Reorganization under Chapter 11 of the Bankruptcy Code [Dkt. No. 61] (the "Disclosure Statement") and respectfully represents as follows:

## I.

## INTRODUCTION

On May 28, 2025 (the "Petition Date"), the Debtor filed its voluntary petition with this Court commencing this case under chapter 11 of the Bankruptcy Code. This is neither a large nor a complex case. However, as is made clear below, the Disclosure Statement and the Plan filed by the Debtor demonstrate that the Debtor has not filed, and cannot file, a confirmable chapter 11 plan in this case. As explained below, the Plan proposed is fatally flawed and unconfirmable on its face, the Disclosure Statement and Plan were not filed in good faith, and the Disclosure Statement is wholly inadequate under 11 U.S.C. § 1125.

Importantly, the record in this case shows that Debtor cannot fund the proposed Plan. The Debtor has had a negative cash flow during its first six months, as shown below:

| Monthly Operating Report | Starting Cash | Ending Cash | Cash Flow |
|---|---|---|---|
| June | $10,255.43 | $3,379.80 | -$6,875.63 |
| July | $3,379.80 | $691.71 | -$2,688.09 |
| August | $691.71 | $5,807.72 | $5,116.01 |
| September | $5,807.72 | $7,293.74 | $1,486.02 |
| October | $7,293.74 | $1,645.29[1] | -$5,648.45 |
| Net Post-Petition Negative Cash Flow | | | -$8,610.14 |

Creditors have filed proofs of claim in this case in the total amount of $3,105,786.05, $1,008,010.60 of which are secured claims.[2]  In light of the Debtor's money-losing performance, it is simply unrealistic for the Debtor perform its financial obligations under the proposed Plan. In fact, despite the fact that this case has been pending over seven months and Debtor has enjoyed a

---

[1] Per bank statement annexed to October 2025 MOR and Disclosure Statement, pg. 5, II.H.
[2] See Claims Register as of January 5, 2026.

lengthy respite from its pre-petition woes, it is doubtful that Debtor can even remain in business as a going concern. Worse, even though the Debtor has the opportunity to show this Court and creditors by way of the Disclosure Statement that it does have a viable business, Debtor fails articulate any strategy to increase its sales, profits and general the positive cash flows necessary to perform any chapter 11 plan - even Debtor's Plan that promises to pay only a token 2.5% of approximately $3 million in claims over the next five years.

Moreover, and most relevant for purposes of this Objection, the Disclosure Statement does not provide adequate information upon which Debtor's creditors can determine whether to vote on the Plan. In fact, the Disclosure Statement provides many reasons for the Court and creditors to conclude that that Debtor has proposed the Plan in bad faith, and is unable to propose and perform under a confirmable plan. First, it is shown below that the Debtor's Plan is fatally flawed and facially unconfirmable. Second, Debtor fails to provide projections or any other financial information demonstrating how the Debtor can pay all secured, administrative and priority tax claims. Third, the Disclosure Statement contains inaccurate – and even fabricated – financial information. Fourth, the Disclosure Statement fails to describe the means for implementation of the Plan, which violates 11 U.S.C. § 1123(a)(5), including, but not limited to the failure to provide standard economic projections that show its ability to perform its obligations to under the Plan to the respective creditor classes, as well as any contribution of value by pre-petition equity holders. Finally, the Debtor's Plan is not proposed in good faith because, among other things:

- Debtor's Plan violates the absolute priority rule because pre-bankruptcy equity holders retain 100% of their interest without any obligation to contribute new value, while proposing to only pay general unsecured creditors 2.5% of their allowed claims over five years;

- Debtor has hidden the value of its intellectual property and gives creditors no idea of what they would receive in a chapter 7 liquidation;

- The Plan allows    to retain her 91% equity interest in violation of the absolute priority rule, the Plan is a mere subterfuge for De Jesu to retain control of the

Debtor's intellectual property at the expense of creditors.

- The Plan fails to give third parties the right to participate through a marketing process as required by *La Salle*, thereby breaching its fiduciary duty to creditors;

For these and all the reasons set forth below, the approval of the Disclosure Statement should be denied.

## II.

### THE DISCLOSURE STATEMENT FALLS FAR SHORT OF PROVIDING ADEQUATE INFORMATION UNDER 11 U.S.C. § 1125 AND SHOULD NOT BE APPROVED.

#### A.    Overall Legal Standard.

Section 1125 of the Bankruptcy Code requires that a disclosure statement contain adequate information "of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan. . . ." 11 U.S.C. § 1125; *In re Ligon*, 50 B.R. 127 (Bankr. N.D. Tenn. 1985). The proponent of a plan has the burden of proof of establishing that the disclosure statement contains adequate information. *In re Jeppson*, 66 B.R. 269 (Bankr. D. Utah 1986). Moreover, the proponent must provide information "as far as is reasonably practicable in light of the history of the debtor and the condition of the debtor's books and records." *In re Dakota Rail, Inc.*, 104 B.R. 138, 142 (Bankr. D. Minn. 1989).

The basic requirement of the foregoing adequate information standard is that disclosure must be based as much as possible on fact and not conclusion or opinion. *In re Dakota Rail, Inc., supra*; *In re Civatella*, 15 B.R. 206 (Bankr. E.D. Pa. 1981). Unless it contains information sufficient to permit a creditor to arrive at an independent and informed judgment, the disclosure statement cannot be approved. *In re East Redley Corporation*, 16 B.R. 429, 430 (Bankr. E.D. Pa. 1982). In addition, a disclosure statement must clearly describe the risks involved with the plan so they may be clearly and understandably identified by creditors voting on the plan. *In re*

*Metrocraft Public Service Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga 1984); *In re Genessee Cement, Inc.*, 31 B.R. 442,444 (Bankr. E.D. Mich. 1982). In describing such risks, the disclosure statement should set forth all factors presently known to the plan proponent in the plan. *In re Stanley Hotel, Inc.*, 13 B.R. 926, 929 (Bankr. D. Colo. 1991).

In addition to the Debtor's failure to disclose adequate information, it is shown below that the Debtor has filed a facially unconfirmable Plan. This alone is sufficient grounds to deny approval of the Disclosure Statement. *See, e.g., In re Eastern Maine Electric Cooperative, Inc.*, 125 B.R. 329 (Bankr. D. Maine 1991) (disclosure statement not approved because the Plan violated the absolute priority rule; court must initially determine whether plan described in the statement displays fatal deficiencies when considering a disclosure statement); *In re 266 Washington Assocs.*, 141 Bankr. 275 (Bankr. E.D.N.Y. 1992) (a bankruptcy court will not approve a disclosure statement when it describes a plan that is fatally flawed and thus cannot be confirmed); *In re Bjolmes Realty Trust*, 134 B.R. 1000 (Bankr. D. Mass. 1991) (a court may rule on confirmation issues in a disclosure statement hearing when it is contended that the proposed plan is so fatally flawed that confirmation is not possible).

**B.     In Addition to a Lack of Adequate Disclosure of Basic Financial Information, the Financial Information Disclosed is Incomplete, False and/or Fabricated.**

Among the factors for a court to evaluate in determining adequacy of a disclosure statement, are ". . . (14) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan [and] (15) information relevant to the risks posed to creditors under the plan . . ." *In re Metrocraft Pub. Servs., Inc.*, 39 B.R. 567, 568 (Bankr.N.D.Ga.1984); *In re Scioto Valley Mortgage Co.*, 88 B.R. 168 (Bankr. S.D. Ohio 1988); *In re Monroe Well Servs., Inc.*, 80 B.R. 324, 331 (Bankr. E.D.Pa.1987); *In re Reilly*, 71 B.R. 132, 134 (Bankr. D. Mont.1987); *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991); *In re U.S. Brass Corp.*, 194 B.R. 420, 424 (Bankr. E.D. Tex. 1996).

**1.     False, Fabricated and Contradictory Financial Information.**

a.     <u>Debtor has materially understated and omitted assets of the estate in the</u>

4

Disclosure Statement.

In Section II.h. of the Disclosure Statement,[3] the Debtor states:

  "The only asset of the Debtor is office furniture with an estimated value of
  $2,000.   According to the Debtor's monthly operating report for October 2025,
  the cash on hand at the end of month."

This false statement contradicts the Debtor's own Bankruptcy Schedules, as well as other portions of the Disclosure Statement itself.[4]   On Schedule B,[5] Debtor admits that it owns substantial intellectual property, which is also referred to in the Disclosure Statement.   Schedule B states:

**60. Patents, copyrights, trademarks, and trade secrets**

Serial No, Patent No: Country:

29/504909 N/A D775792 (US)

90/015060 N/A Certificate 12229 (US)

14/837063 2016-0100648 10,021,930 (US)

16/032855, 2018-0317586, Abandoned (US)

17/965532 (US)

90/019133 N/A (US)

PCT/US16/48541, WO20170325299 (PCT)

P6000294/2018 (UAE)

2016311352, 2016311352 (AU)

2996861, 2996861 (CA)

201680062994.7, 108697189, 108697189 (CN)

202110535292.9, 113349500 (CN)

16840081, 3340822 (EP)

---

[3] DS, pg. 5.
[4] Since the Disclosure Statement is riddled with fabricated information, it is hardly surprising that it internally inconsistent.
[5] Voluntary Petition and Schedules, Schedule B, pg. 3, item no. 60 [Dkt. No. 1].

19122316.3, HK1262454, HK1262454 (HK)

42022049364.7, HK40061818 (HK)

42022049364.7, HK40061818 (HK)

In addition, in the Disclosure Statement Debtor describes itself as "an innovative designer of upscale shower caps and related products," clearly a reference to intellectual property designs owned by the Debtor.[6] Further Debtor describes "extensive litigation" with respect to its attempt to "enforce their patent rights" which "caused considerable damage to the brand's reputation."[7] These statements – mentioning intellectual property and proprietary brands - are consistent with its list of patents on Schedule B. In addition, in certain pre-petition litigation, Debtor admits and alleges that it owns valuable intellectual property rights. Annexed hereto as Exhibit "1" is the *Defendant's Counterclaims to First Amended Complaint for Declaratory Judgment and Demand for Jury Trial* filed in certain pre-petition litigation (the "Counterclaim"). In the Counterclaim, the Debtor describes "valuable" trademark rights[8] and patent rights.[9] However, these statements directly contradict the Debtor's false assertion that its assets consist only of some used furniture and its shrinking cash balance. Moreover, the Debtor filed a heavily redacted valuation report in the same litigation proceeding, further evidencing that the Debtor's intellectual property is of significant value.[10]

This glaring omission of the Debtor's primary assets cannot be just scrivener's error or use of counsel's "boilerplate" disclosure statement recycled from another case. In fact, there are at least two very good reasons that the Debtor would want to understate or exclude assets in its Disclosure Statement. First, the Debtor states in the Disclosure Statement – and it's counsel has repeatedly argued – that the Debtor intends to disallow or "reclassify" various secured creditor claims based on the value of their respective collateral under 11 U.S.C. § 506(a). If Debtor's assets

---

[6] DS, II.a., pg. 3.
[7] *Id*.
[8] *See* Counterclaim, pp. 3 - 4, ¶¶ 9 – 14, of which the Court is requested to take judicial notice.
[9] *Id*. at pp. 4 – 6, ¶¶ 15 – 24.
[10] *See* Exhibit "2", of which the Court is requested to take judicial notice.

are only used furniture and a small cash balance, then there is not much value to any of the secured creditors' collateral. Second, another reason for Debtor to understate its assets is because the Plan violates the "absolute priority rule". Artificially devaluing the company may support a conclusion that any new capital contribution needed from its pre-petition shareholders to retain their equity would be *de minimis*.

Clearly, the Debtor's lack of candor and dishonesty with the Court with respect to the Debtor's assets is improper. Further, given the materiality of these misrepresentations and omissions should not be excused with an "ooops" or "we'll correct that Your Honor!". This case has been plagued with inaccurate statements about the Debtor's financial information, performance and projections.[11] This inexcusable conduct should not be rewarded by approving the Disclosure Statement and allowing the Debtor to continue prosecuting its unconfirmable plan.

        b.     <u>Debtor's "Liquidation Analysis" contains fabricated asset information and omits financial obligations</u>.

The Liquidation Analysis in the Disclosure Statement is incomplete and contrary to information previously provided to this Court under penalty of perjury. *See* DS, Ex. D.

        1.     <u>Fabricated receivables</u>. Debtor states in the Liquidation Analysis that it has "Receivables" of $50,000.00. This is directly contradicted by Debtor's monthly operating report annexed as Exhibit "C" to the Disclosure Statement, which states that there are exactly $0.00 in receivables.[12] Other than a possible desire to falsely give the Court and creditors the idea that Debtor *actually* does have a business that generates receivables, there is no conceivable explanation for this fabricated asset.

        2.     <u>Ignoring the value of intellectual property</u>. In the Liquidation Analysis, no value is attributed to valuable intellectual property which was the subject of substantial pre-bankruptcy

---

[11] *See, e.g., Objection By Kitsch LLC To Debtor's Motion For An Order Extending Plan Exclusivity Period Pursuant 11 U.S.C. § 1121(d)(1)*, pg. 2 – 6 [Dkt. No. 52].

[12] *See* Ex. C, Section 4, item 25. In fact, Debtor has shown exactly $0.00 receivables on each of its monthly operating reports in this case.

litigation. As stated above, Debtor claims that this bankruptcy was – at least in part – precipitated by litigation prompted by its efforts to protect certain of its intellectual property.[13] Indeed, as shown above and admitted in the Disclosure Statement, Debtor expended substantial resources in this effort. Notably, on Debtor's Schedule B, Debtor lists many other patents it owns which do not appear to have been the subject of the pre-petition litigation in which the Counterclaim was filed by Debtor. All of the Debtor admissions in its Schedules, as well as the admissions and allegations in pre-petition litigation, demonstrates that Debtor holds valuable intellectual property rights; however, for purposes of this bankruptcy case, Debtor has intentionally and dishonestly valued *all* of its intellectual property at $0.00 in its Liquidation Analysis.

        3.      <u>The Liquidation Analysis is incomplete</u>.

Under 11 U.S.C. § 1129(a)(7) requires the Debtor show how the Plan provides an equal or better treatment that in a hypothetical chapter 7 liquidation. The Debtor's Liquidation analysis does not provide a comparison of the two scenarios – i.e., the treatment of claims under the Plan vs. a hypothetical liquidation. Therefore, creditors are not provided adequate information of whether the Plan is superior to a conversion of this case to chapter 7.

        **2.**      **The Disclosure Statement Lacks Projections Showing Feasibility of the Plan**.

The Debtor fails to provide any information to determine whether the Debtor will be able to comply with the Plan's financial requirements. This alone is grounds to deny approval of the Disclosure Statement. *See Metrocraft Pub. Servs., Inc.*, 39 B.R. at 568. This violates 11 U.S.C. § 1123(a)(5), which requires a plan to provide "adequate means for the plan's implementation," and 11 U.S.C. § 1129(a)(11), which requires that the Debtor show that is can continue as a going concern.

        a.      <u>Insufficient Disclosure Re Administrative/Effective Date Payments</u>.

The Debtor does not provide any projections that demonstrate it can pay its administrative

---

[13] *See* DS, Section II.a., pg. 3.

and other priority claims. Debtor estimates that unpaid administrative priority professional fees will be $32,000 as of the confirmation of date.[14] In addition, it appears that Debtor has not disclosed all unpaid administrative priority claims. For example, on December 24, 2025, Shopify filed a motion to allow post-petition administrative claim for amounts due totaling $22,928.17 as of the date of that motion. There may be other undisclosed administrative claims, all of which must be paid on the effective date of the Plan,[15] which will factor heavily into whether a chapter 11 plan is feasible given the Debtor's minimal cash resources. As mentioned, as of October 31, 2025, it had only approximately $1,600.00 in its bank account. Debtor fails to disclose sufficient financial information to explain how Debtor will pay these mounting administrative priority expenses and professional fees.

        b.    <u>Insufficient Disclosure Re Plan payments</u>.

In addition to the failure to explain how it will be able to pay administrative claims, Debtor only had approximately $1,600 of cash on hand as of October 31, 2025; yet it will have professional fees plus Shopify's administrative claim which aggregates over $50,000 which must be paid on the Plan Effective Date. Further, Debtor fails to provide any projections or other information demonstrating that it will make the proposed monthly plan payments of $2,275.91 to general unsecured creditors over 60 months. Notably, as mentioned above, this monthly plan payment assumes that Debtor will be successful in "reclassifying" approximately $1 million[16] of secured creditor claims held by four different creditors to general unsecured claims. Unless the Debtor is 100% successful in this claim litigation, Debtor's Plan will become even more infeasible.

---

[14] *See* DS, Section III.b.i., pg. 6.

[15] Section 8.02 of the Plan states that the Effective Date shall be no later than 30 days after the entry of the Confirmation Order.

[16] Debtor does not disclose the risk that it will not be successful in "reclassifying" these substantial secured claims as "unsecured".

| Class 3 | Forward Finance | $160,823.54 |
| Class 4 | Knobbe, Martens | $188,946.23 |
| Class 4 | Winthrop Couchot | $72,735.25 |
| Class 5 | SBA | $572,356.81 |
| Total | | $994,861.83 |

Debtor's failure to disclose this risk is a material omission, especially in light of Debtor's dismal financial performance since the Petition Date.

Based on Debtor's actual financial post-petition performance, Debtor does not demonstrate how it can possibly make even the very modest 2.5% distributions to its general unsecured creditors over 60 months required in its Plan. In reality, Debtor has proposed a Plan that it has no chance of being able to perform, and deliberately has not disclosed sufficient financial information for the Court and creditors to understand that.

**C.     The Disclosure Statement Does Not Adequately Describe Potential Avoidance Claims, and Why the Debtor Believes None Exist.**

The requirement that detailed information about potential avoidance actions or other potential litigation claims be disclosed under 11 U.S.C. § 1125 is well-established. Regarding of disclosure of potential litigation claims, the Third Circuit in *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corporation*, 337 F. 3d 314 (3d Cir. 2003) stated:

> "Under 11 U.S.C. § 1125(b), a party seeking chapter 11 bankruptcy
> protection has an affirmative duty to provide creditors with a disclosure
> statement containing "adequate information" to "enable a creditor to make
> `an informed judgment' about the Plan." 11 U.S.C. § 1125(a) (1). Debtors
> must therefore identify and disclose all "property of the estate" including all
> of the debtor's "legal and equitable" property interests. This includes such
> contingent assets as any cause of action [debtor] Krystal may have against
> GM, and Krystal does not argue to the contrary. The nature of Krystal's
> purported misrepresentations here can fully be appreciated if we place them
> within the proper context.
>
> "A long-standing tenet of bankruptcy law requires one seeking benefits
> under its terms to satisfy a companion duty to schedule, for the benefit of
> creditors, all his interests and property rights." *Oneida*, 848 F.2d at 416.
> Therefore, "preparing and filing a disclosure statement is a critical step in

the reorganization of a Chapter 11 debtor." *Id.* at 417. It has been called by

one commentator, "the pivotal concept in reorganization of a Chapter 11

debtor." *Id.*

The importance of full disclosure is underlaid by the reliance placed upon

the disclosure statement by the creditors and the court. Given this reliance,

we cannot overemphasize the debtor's obligation to provide sufficient data

to satisfy the Code standard of 'adequate information'."

*Id.* at 417.

Despite the importance of this type of disclosure, Debtor's Disclosure Statement merely

states: "No avoidable transfers have been identified in the case; therefore Debtor does not intend

to pursue any preference, fraudulent conveyance, or other avoidance action under §§ 544 through

553 of the Bankruptcy Code." This so-called "disclosure" is even more offensive give that this

is the boiler-plate disclosure used by Debtor's counsel in other disclosure statements filed before

this Court.[17] This "boiler plate" disclosure is insufficient to satisfy § 1125. *See Krystal*

*Cadillac-Oldsmobile GMC Truck, Inc. v. General* Motors Corp., 337 F.3d 314 (3rd Cir. 2003)

(finding that boilerplate language in disclosure statement that did not specify or attempt to place

any monetary value on claims was not adequate to provide the level of notice required). Debtor

should disclose the Debtor's efforts to identify potential avoidance actions for the benefit of the

estate, and whether transactions or other facts exist that must still be investigated.

**D.     The Disclosure Statement Does Not Adequately Describe Compensation to
Be Paid to Post-Confirmation Management.**

With respect to the identity and compensation for the Debtor's post-confirmation

management, the Disclosure Statement merely states that "Jacquelyn De Jesu as president and

90.15% shareholder of the Debtor will continue to manage the day-to-day business operations of

---

[17] *See, e.g., In re New Cafe Minutka, Inc.* Case No. 1-19-42357-nhl, *Fourth Amended Disclosure*
*Statement for Small Businesses under Chapter 11 for Plan of Reorganization of the Debtor under*
*Chapter 11 of the Bankruptcy Code*, Dkt. No. 125, pg. 4., Section II.f.

the Debtor and will continue to be employed by the business." First, De Jesu is *not* an employee of the Debtor, as the Debtor has maintained throughout this case that it has no employees. Moreover, the Disclosure Statement fails to meet the disclosure requirement of § 1129(a)(5)(B), which requires a plan proponent to disclose the nature of any compensation for any insider that will be employed or retained by the reorganized debtor. Such information must be disclosed with respect to each director, officer, person in control of the Debtor, and any relatives of the directors, officers and persons in control of the Debtor. The Disclosure Statement fails to satisfy this requirement.

**E. Debtor's Plan is Fatally Flawed and not Confirmable on its Face; Therefore, the Disclosure Statement Should Not be Approved.**

**1. The Plan Violates the Absolute Priority Rule.**

The Debtor's Plan is facially unconfirmable because it violates the absolute priority rule as codified in 11 U.S.C. § 1129(B)(2)(b). Although Debtor is only paying 2.5% to Class 6 general unsecured creditors, the Debtor's equity holders retain 100% of their equity interests which they held as of the Petition Date. This violates the absolute priority rule which requires that all creditors must be paid in full in order for equity interest holders to retain their pre-petition equity interests in the debtor. Further, as the United States Supreme ruled in *Bank of America National Trust and Savings Association v. 203 LaSalle Street Partnership*, 119 S. Ct. 1411, 119 S.Ct. 1411 (1999), pre-petition equity holders can only retain their equity interests if either unsecured creditors are paid in full, or the plan provides an opportunity for outside parties (i.e., those who were not previously equity holders) to bid for these equity interests to ensure that sufficient value is contributed pursuant to the "new value corollary" of the absolute priority rule.[18]

The Plan does not satisfy either of these two conditions. The Plan provides for only a 2.5% payout to unsecured creditors over five years, and it also fails to provide an opportunity for outside parties to bid for equity interests in the Debtor. Further, the Plan does not require that

---

[18] See, 11 U.S.C. § 1129(b)(2)(B).

current equity holders themselves contribute new value to the Debtor in order to retain their equity interests.

There are five elements to fulfilling the new value corollary.  In re Bonner Mall Partnership, 2 F.3d 899 (9th Cir.1993), *mot. to vacate denied and cert. dismissed,* 513 U.S. 18, 115 S. Ct. 386, 130 L.Ed.2d 233 (1994). "Former equity owners [are] required to offer value that [is] (1) new, (2) substantial, (3) money or money's worth, (4) necessary for a successful reorganization and (5) reasonably equivalent to the value or interest received." *Id.* at 908 (citing *Case v. Los Angeles Lumber*, 308 U.S. 106, 121-22 (1939) and *Snyder v. Farm Credit Bank of St. Louis (In re Snyder)*, 967 F.2d 1126, 1131 (7th Cir.1992)).  None of these five elements are present because the Plan does not require any of the current equity holders to contribute new value to retain their equity interests.  Therefore, the Plan is unconfirmable on its face.

Moreover, even if current equity holders were contributing some (currently undisclosed) new value in order to retain their equity interests post-confirmation, it is well-established that the Plan must be subject to a "market test" to ensure that the consideration that will both purportedly be received by the estate and distributed under the Plan is reasonable and fulfills the Debtor's fiduciary duty to maximize the value of the estate for the benefit of creditors. As stated in *LaSalle*: "[P]lans providing junior interest holders with exclusive opportunities free from competition and without benefit of market valuation fall within the prohibition" of the absolute priority rule.  *LaSalle*, 526 U.S. at 458, 119 S. Ct. at 1424.  "[I]t is the exclusiveness of the opportunity, with its bid protection against the market's scrutiny of the purchase price means of competing bids or even competing plan proposals, [that] renders the partners' right a property interest extended 'on account of' the old equity position . . . ." 526 U.S. at 456, 119 S. Ct. at 1423. "Under a plan granting an exclusive right, making no provision for competing bids or competing plans, any determination that the price was top dollar would necessarily be made by a judge in bankruptcy court, whereas the best way to determine value in exposure to a market."  526 U.S. at 457, 119 S. Ct. at 1423.

The Supreme Court in *LaSalle* made it clear that granting the "exclusive opportunity to propose a plan" to pre-petition equity holders – even those contributing value - caused a violation of

the absolute priority rule. The Court held that, because "no one else could propose an alternative" plan, "the Debtor's partners necessarily enjoyed an exclusive opportunity that was in no economic sense distinguishable from the advantage of the exclusively entitled offeror or option holder." 526 U. S. at 454.

Of course, in this case, there has been no exposure of the Debtor's assets to the market to achieve maximum value for the estate and creditors. Under *LaSalle*, this violates the absolute priority rule. Further, Debtor's (and the equity holders') scheme is also contrary to the Debtor's fiduciary duties to the estate and its creditors. Debtors in possession have "a fiduciary duty to protect and maximize the estate's assets." *Burch v. Ganz* (*In re Mushroom Transp. Co.*), 382 F. 3d 325, 339 (3rd Cir. 2004).

> In Chapter 11 cases where no trustee is appointed, § 1107(a) provides that
> the debtor-in-possession, *i.e.*, the debtor's management, enjoys the powers
> that would otherwise vest in the bankruptcy trustee. Along with those
> powers, of course, comes the trustee's fiduciary duty to maximize the value
> of the bankruptcy estate.

*Official Committee ex rel. Cybergenics v. Chinery,* 330 F. 3d 548, 573 (3d Cir. 2003)(en banc).[19]

The Debtor's Plan violates the absolute priority rule as described in *La Salle* and is unconfirmable on its face. Therefore, the Disclosure Statement should not be approved.

### 2. The Treatment of Priority Tax Claims does not Comply with §1129(a)(9)(C).

The Debtor identifies two § 507(a)(8) priority tax claims – that of the New York Department of Labor in the amount of $23,687.82 and that of the Internal Revenue Service in the amount of $22,053.37. Under § 1129(a)(9)(C)(ii), these claims must be paid in full "over a

---

[19] "The willingness of Congress to leave a debtor in possession is premised on an expectation that current management can be depended up on to carry out the fiduciary responsibilities of a trustee." *In re Marvel Entertainment Group, Inc.*, 140 F. 3d 463, 474 (3d Cir. 1998)(quotations omitted).

period ending not later than 5 years" after the Petition Date; i.e., the five-year period starts from the date the Debtor's chapter 11 petition was filed, not later. The Plan violates this requirement. With respect to the Department of Labor claim, the Debtor proposed to pay this claim over a period of five years starting "on the Effective Date". Given that this case was filed on May 28, 2025, the Effective Date of the Plan will be several months (if ever) after the Petition Date. Therefore, absent a timely and feasible amendment to the Plan, the Plan is unconfirmable. Similarly, the Plan provides that the IRS's claim will be paid "within the period of time agreed by the claim holder." The time limit of § 1129(a)(9)(C)(ii) does not change based on agreement with the claim holder. Therefore, absent an amendment to the Plan that conforms to the time limit contains in § 1129(a)(9)(C)(ii), the Plan is unconfirmable as it violates the express statutory requirements of the Bankruptcy Code.[20] Finally, Debtor fails to disclose whether it will pay the statutory interest that will accrue on these priority tax claims, and therefore the amount of such payments are understated.

**F. The Disclosure Statement Does Not Provide Adequate Information With Respect to the "Best Interests" Test of § 1129(a)(7).**

Section 1129(a)(7) "is one of the cornerstones of chapter 11 practice." 7 Collier on Bankruptcy ¶ 1129.02[7] 1129-33 (16th ed. 2014). For Class 5 and Class 6 creditors who are impaired under the Plan,[21] the Debtor's Plan must provide value in an amount not less than they would receive in the event of a chapter 7 liquidation. § 1129(a)(7)(A)(ii), The Debtor bears the burden of demonstrating that the Plan satisfies the "best interest" test. *See, e.g.*, *In re GSC, Inc.*, 453 B.R. 132, 179 n.66 (Bankr. S.D.N.Y. 2011) ("The proponents of a plan bear the burden of proof under section 1129(a)(7)." (citing *ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 366 (S.D.N.Y. 2007))); *In re Jennifer*

---

[20] See § 1129(a)(1). "(a)The court shall confirm a plan only if all of the following requirements are met: (1) The plan complies with the applicable provisions of this title."

[21] Except for the unlikely creditor that will vote for a Plan proposing to pay a very uncertain 2.5% over five years.

*Convertibles, Inc.*, 447 B.R. 713, 724 (Bankr. S.D.N.Y. 2011) (noting that the burden to satisfy section 1129(a)(7) is on the debtors). This test "focuses on individual creditors rather than classes of claims . . . [and] requires that each holder of a claim or interest either accept the plan or receive or retain property having a present value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor were liquidated under Chapter 7." *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 761 (Bankr. S.D.N.Y. 1992) (internal citation omitted). *See also In re Leslie Fay Cos., Inc.*, 207 B.R. 764, 787 (Bankr. S.D.N.Y. 1997) (stating that in applying the best interests test, the court "must find that each [dissenting] creditor will receive or retain value that is not less than the amount he [or she] would receive if the debtor were liquidated.") (citation omitted). In that way, "[i]t is an individual guaranty to each creditor or interest holder that it will receive as much in reorganization as it would in liquidation." 7 Collier on Bankruptcy ¶ 1129.02[7]. *See also In re Crowers McCall Pattern, Inc.*, 120 B.R. 279, 297 (Bankr. S.D.N.Y. 1990) ("To be sure, the command of section 1129(a)(7)(A)(ii) is perhaps the strongest protection creditors have in chapter 11.")

On its face the Plan is unconfirmable because the Debtor would not be able to satisfy its burden of proof that the Plan under § 1129(a)(7)(A)(ii). As explained above, the Disclosure Statement's so-called "Liquidation Analysis" ascribes no value to the Debtor's intellectual property, merely stating that its value is "unknown".[22] Moreover, Debtor fails to disclose any effort to value its intellectual property - whether by employing a valuation expert or conducting a marketing effort offering its trademarks and patents for a public sale. This glaring lack of disclosure regarding the value of its intellectual property is even more suspect in light of Debtor's extensive pre-bankruptcy litigation efforts to enforce these allegedly valuable intellectual property rights. The almost total non-disclosure of these assets[23] is – again – indicative of this Debtor's "hide the ball" tactics, lack of candor and disingenuous conduct in this

---

[22] Disclosure Statement, pg. 72.
[23] As explained above, Debtor omits its intellectual property in the description of its assets, and only generally refers to these assets as valueless "patents" on the very last page of the Disclosure Statement.

case.  The purported Liquidation Analysis in the Disclosure Statement cannot possibly be construed to be adequate disclosure for purposes of establishing that the best interests test is met. Without significantly greater and objective disclosure regarding the value of the estate's assets, a creditor has no idea whether a chapter 7 liquidation of the estate's assets would provide a greater, more certain return than a very uncertain and wholly unsupported 2.5% dividend over the next five years.  Therefore, the Court should deny approval of the Disclosure Statement.

      **G.**    **Debtor Fails to Disclose the Risks Posed to Creditors under the Plan.**

As stated above, a disclosure statement must clearly describe the risks involved with the plan so they may be clearly and understandably identified by creditors voting on the plan. *Metrocraft*, 39 B.R. at 568; *Genessee Cement*, 31 B.R. at 444.  In describing such risks, the disclosure statement should set forth all factors presently known to the plan proponent in the plan. *Stanley Hotel*, 13 B.R. at 929. The Debtor fails to carry its burden to explain the risks inherent in its Plan.

As set forth above, Debtor's post-petition economic performance does not come close to being able to generate the cash needs of this Debtor to fund its administrative expenses, priority tax debt, and its measly 2.5% payment to general unsecured creditors.  Debtor fails to disclose that even in the rosiest scenario, including the recharacterization of nearly $1 million of secured debt to general unsecured claims, there are no projections – nor can there be – that Debtor can perform its Plan.  Debtor fails to disclose the grounds upon which it will challenge the aforementioned secured claims, nor the risks of its failure to successfully do so.  Moreover, Debtor does not disclose that there is a risk of other administrative creditors – such as Shopify – that may file claims for payment which Debtor does not have sufficient cash to pay on the Effective Date as required by 11 U.S.C. § 1129(a)(9)(A)**.**  Debtor also fails to inform creditors that it has experienced an overall negative cash flow, and if such continues, Debtor will not be able to fund its Plan. Moreover, the Debtor does not address the pending Shopify motion to terminate its contract with the Debtor, which may severely impair the Debtor's ability to continue operations.

**H.**    **The Plan Has Not Been Proposed in Good Faith; Therefore, the Disclosure Statement Should not be Approved.**

To be confirmed, a plan must be proposed in good faith and not by any means forbidden by law. 11 U.S.C. § 1129(a)(3).  To meet this standard, the plan proponent must establish three elements: "'(1) [the plan] fosters a result consistent with the Code's objectives ..., (2) the plan has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected ..., and (3) there was fundamental fairness in dealing with the creditors.'"  *In re Washington Mutual, Inc*., 461 B.R. 200, 239 (Bankr. D. Del. 2011), quoting *In re Genesis Health Ventures, Inc.,* 266 B.R. 591, 609 (Bankr. D. Del. 2001).  The Debtor's Plan fails to satisfy any of the foregoing three requirements for a plan to satisfy the good faith requirement of § 1129(a)(3).

**1.    The Plan does not Foster a Result Consistent with the Code's objectives.**

As shown above, Debtor has proposed a plan that violates the absolute priority rule of § 1129(b)(2)(B), whereby unsecured creditors shall only receive 2.5% of their allowed claims yet pre-petition equity holders retain 100% of their ownership interest without any contribution of new value.  Neither the Disclosure Statement nor the Plan explain how the Plan can be confirmed given this fatal flaw.  Additionally, contrary to the Supreme Court's *La Salle* decision, the Plan does not contain provisions that allow for market-testing nor making equity available to third parties that are not current equity holders.  Therefore, the Plan is a naked attempt by management to retain control and force creditors to bear the risk of Debtor's failure to perform its meager obligations under the Plan.   Further, as stated above, the violation of the dictates of the absolute priority rule and *La Salle* is a breach of Debtor's fiduciary duties to its creditors. Moreover, the Plan violates the Bankruptcy Code's required treatment of § 507(a)(8) priority tax claims, and there is no demonstration that the Plan satisfies the best interests test of § 1129(a)(7). Due to the violation of the statutory provisions of § 1129 and the *La Salle* decision, the Plan if fatally flawed and was not proposed in good faith.

2.    The plan has not been proposed with honesty and good intentions and with a basis for

<u>expecting that reorganization can be effected</u>.

As explained above, the Debtor has not been honest and candid with this Court regarding its assets and business operations. The Debtor omitted its intellectual property from the description of its assets and, as described above, creditors have no idea of whether they would be better off if the Debtor were liquidated in a chapter 7 case. Further, given that the Plan allows De Jesu to retain her 91% equity interest in violation of the absolute priority rule, the Plan is a mere subterfuge for her retaining control of this intellectual property at the expense of creditors. In addition, Debtor fabricates an asset class entitled "Receivables" in its liquidation analysis in the amount of $50,000, which is non-existent in any of the Debtor's monthly operating reports filed in this case. Debtor's "hiding the ball" and fabrication of financial information demonstrates a lack of honesty and "good intention". Further, there is no disclosure that demonstrates that the proposed reorganization can be effectuated. The Debtor does not provide standard economic projections that demonstrate its ability to perform its obligations to under the Plan to the respective creditor classes. Of course, this problem is even more acute given Shopify's recently filed motion to allow a sizeable administrative claim. This shows that this second requirement of a "good faith" plan is not satisfied.

3. <u>There is a lack of fundamental fairness in dealing with the creditors</u>.

Debtor has demonstrated a lack of fundamental fairness in dealing with creditors for at least the following reasons:

- Debtor has hidden the value of its intellectual property and gives creditors no idea of what they would receive in a liquidation;

- Debtor fails to provide projections to establish its ability to perform under the Plan;

- Debtor's pre-bankruptcy equity holders retain 100% of their interest without any obligation to contribute new value, despite the absolute priority rule;

- the Plan fails to give third parties the right to participate through a marketing process as required by *La Salle*, thereby breaching its fiduciary duty to creditors;

19

- Debtor fails to adequately disclose the risks of Debtor be unable to perform its obligations under the Plan.

In summary, the Plan has been proposed in bad faith. Therefore, the Disclosure Statement should not be approved.

<div align="center">

**III.**

**<u>CONCLUSION</u>.**

</div>

For the foregoing reasons, Debtor has failed to meet its burden to under to provide adequate information to creditors to enable them to make an informed decision about the Plan under 11 U.S.C. § 1125(b). Therefore, Debtor's request to approve the Disclosure Statement should be denied.

Dated: January 12, 2026

Respectfully submitted,

Daniel H. Reiss, Esq.
LEVENE, NEALE, BENDER, YOO &
GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: dhr@lnbyg.com



EXHIBIT "1"

Matthew R. Gershman (SBN 253031)
gershmanm@gtlaw.com
GREENBERG TRAURIG, LLP
1840 Century Park East
Los Angeles, CA 90067
Tel.: (310) 586-7700/Fax: (310) 586-7800

*Attorneys for Defendant*
*Deejayzoo, LLC*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| Kitsch LLC, a California company, | Case No.  2:19-cv-02556-JAK-RAO |
| Plaintiff, | **DEFENDANT'S COUNTERCLAIMS TO FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND DEMAND FOR JURY TRIAL** |
| v. | |
| DEEJAYZOO, LLC, a New York company, | |
| Defendant. | |
| DEEJAYZOO, LLC, a New York company, | |
| Counter-Claimant, | |
| v. | |
| DEEJAYZOO, LLC, a New York company, | |
| Counter-Defendant. | |

Defendant Deejayzoo, LLC ("Deejayzoo") hereby submits these Counterclaims to Plaintiff Kitsch LLC's ("Kitsch") First Amended Complaint for Declaratory Judgment ("FAC").

## THE PARTIES

1.     Counterclaim Plaintiff Deejayzoo, LLC is a Limited Liability Company organized under the laws of the state of New York with a principal place of business at 337 Kent Avenue, Brooklyn, New York 11249.

2.     On information and belief, Counterclaim Defendant Kitsch LLC is a Limited Liability Company organized under the laws of California, having a principal place of business at 307 N. New Hampshire, Los Angeles, California 90004.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction pursuant to 35 U.S.C. § 271, 18 U.S.C. § 1836(c), and 28 U.S.C. §§ 1331, 1338(a), (b), 1367, and 1400(b).

4.     This Court has personal jurisdiction over Kitsch, because Kitsch is present, doing business and/or residing in this District, because Kitsch has committed tortious acts and violated Deejayzoo's intellectual property rights in this District, because Kitsch knew or should have known that such conduct would cause injury to Deejayzoo in the State of California, and because Kitsch filed a complaint to begin this action.

5.     Venue is proper in the United States District Court for the Central District of California under 28 U.S.C. §§ 1391(b), 1391(c), and 1400(b).

## DEEJAYZOO'S HEADPIECE PRODUCTS

6.     Deejayzoo develops, designs, produces, and sells fashion-forward, high-quality headpieces that are marketed and distributed under the federally registered he THE SHOWER CAP REINVENTED mark.  Before the introduction of Deejayzoo's products, headpieces for use in the shower were typically unattractive, uncomfortable, and loud. Deejayzoo vastly improved these tired old headpieces by introducing noise-dampening materials and inventing a construction with a comfort band, stylish design, and attractive prints suitable for wear outside in public.  In so doing, Deejayzoo created an entirely new

product niche: the fashionable, reusable, comfortable headpiece, i.e. shower caps.

7.    Deejayzoo markets and sells its shower caps through various websites and retail outlets, such as Sephora and Neiman Marcus.  Deejayzoo has received acclaim for its revolutionary shower caps recognizing that Deejayzoo represented a novel, fresh take on the shower cap.

8.    Deejayzoo has invested substantial resources to obtain trademark, patent, and other intellectual property rights to protect its place in the fashionable, reusable headpiece market—the very market that Deejayzoo itself created and cultivated.  Deejayzoo is the holder of United States patents and trademark registrations relating to and covering its SHHHOWERCAP product.

## DEEJAYZOO'S VALUABLE TRADEMARK RIGHTS

9.    Deejayzoo develops, designs, produces, and sells fashion-forward, high-quality headpieces that are marketed and distributed under the federally registered he THE SHOWER CAP REINVENTED mark.  Before the introduction of Deejayzoo's products, shower caps were typically unattractive, uncomfortable, and loud.  Deejayzoo vastly improved these tired old headpieces by introducing noise-dampening materials and inventing a construction with a comfort band, stylish design, and attractive prints suitable for wear outside in public.  In so doing, Deejayzoo created an entirely new product niche: the fashionable, reusable, comfortable headpiece.

10.    Deejayzoo owns and uses several valuable trademarks, including the THE SHOWER CAP REINVENTED Mark.

11.    Since at least as early as December 6, 2015, Deejayzoo and its predecessor in interest has used and continues to use the THE SHOWER CAP REINVENTED Mark in conjunction with its innovative and unique headpieces.

12.    An example of use of the THE SHOWER CAP REINVENTED mark by Deejayzoo is on packaging for its SHHHOWERCAP product, shown below:



13.    On May 23, 2017, the United States Patent and Trademark Office ("USPTO") duly and legally issued U.S. Registration No. 5,208,472 for THE SHOWER CAP REINVENTED Mark.

14.    Deejayzoo is the owner of all right, title and interest in and to the THE SHOWER CAP REINVENTED Mark and has the right to sue for infringement of the THE SHOWER CAP REINVENTED Mark.

## DEEJAYZOO'S PATENT RIGHTS

15.    On October 10, 2014, design patent application no. 29/504,909, entitled "Noise Reducing Water Resistant Headwear Cap" ("'909 application") was filed with the USPTO.

16.    On January 10, 2017, the USPTO duly and legally issued U.S. Patent No. D775,792 ("D'792 Patent") from the '909 application.

17.    A true and correct copy of the D'792 Patent is attached as Exhibit A.

18.    The D'792 Patent discloses and claims a novel, ornamental design for a headpiece, shown in part below:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



FIG.1                    FIG.3



FIG.8

19.    Deejayzoo is the owner of all right, title and interest, by way of assignment, in and to the D'792 Patent and has the right to sue for infringement of the D'792 Patent.

20.    On August 27, 2015, utility patent application no. 14/837,063, entitled "Noise Reducing Water Resistant Headpiece" ("'063 application") was filed with the USPTO.

21.    On July 17, 2018, the USPTO duly and legally issued U.S. Pat. No. 10,021,930 ("'930 Patent") from the '063 application.

22.    A true and correct copy of the '930 Patent is attached as Exhibit B.

23.    The '930 Patent discloses and claims, among other things, a covering apparatus comprising a unitary material; a grip; an elastic member; a gathered band; and

an elongated band; wherein the gathered band and the elongated band are of a unitary construction; wherein the gather band and the elongated band are attached to a periphery of the covering apparatus; wherein the elastic member is enclosed within the gathered band; wherein the unitary material comprises an outer layer and an inner layer; wherein the outer layer comprises a fabric; wherein the outer layer is water repellent; wherein the inner layer is polyurethane; wherein the covering apparatus comprises a plurality of folds; wherein the plurality of folds culminate in a point at a front of the covering apparatus above the elongated band; wherein the elastic member is located at a rear of the covering apparatus; and wherein the covering apparatus is a shower cap.

24.    Deejayzoo is the owner of all right, title and interest, by way of assignment, in and to the '930 Patent and has the right to sue for infringement of the '930 Patent.

## KITSCH'S INFRINGING SHOWER CAPS

25.    On information and belief, Kitsch has sold Kitsch Shower Caps through various channels, including Kitsch's own website (www.mykitsch.com), Paper Source, Urban Outfitters, Amazon, Walgreens, South Moon Sales, QVC, Got Beauty, Shop Bop, Kali Beauty, Belle and Blush, Scheels, Von Maur, Riley Rose, and Express.

26.    The Kitsch Shower Caps are and have been sold in several different patterns, including at least the following:

- Luxe Shower Cap – Floral;
- Luxe Shower Cap – Blush Dot;
- Luxe Shower Cap – Palm Leaves;
- Luxe Shower Cap – Black; and
- Luxe Shower Cap – Black and White Stripe.
- Kayley Melissa X Kitsch Shower Cap

27.    Kitsch has advertised and sold, and continues to advertise and sell, the Kitsch Shower Caps in interstate commerce in association with the mark "THE SHOWER CAP, REINVENTED" (the "Counterfeit Mark") as shown below:



28.     Kitsch's use of the Counterfeit Mark is identical to and confusingly similar to Deejayzoo's THE SHOWER CAP REINVENTED Mark in appearance, sound, meaning, and commercial impression.

29.     Kitsch's use of the Counterfeit Mark trades off of the goodwill of Deejayzoo's THE SHOWER CAP REINVENTED Mark and is without permission or license from Deejayzoo.

30.     Kitsch's infringement of Deejayzoo's THE SHOWER CAP REINVENTED Mark has been and continues to be knowing and willful.  Kitsch was on constructive notice of the THE SHOWER CAP REINVENTED Mark by virtue of its federal registration.  Kitsch has been on actual notice of its infringing activity since no later than July 19, 2018.

31.     The Kitsch Shower Cap incorporates the design illustrated and claimed in the D'792 Patent, and therefore the Kitsch Shower Cap infringes the D'792 Patent.

32.     The Kitsch Shower Caps comprise a covering apparatus comprising a unitary material; a grip; an elastic member; a gathered band; and an elongated band; wherein the

gathered band and the elongated band are of a unitary construction; wherein the gather band and the elongated band are attached to a periphery of the covering apparatus; wherein the elastic member is enclosed within the gathered band; wherein the unitary material comprises an outer layer and an inner layer; wherein the outer layer comprises a fabric; wherein the outer layer is water repellent; wherein the inner layer is polyurethane; wherein the covering apparatus comprises a plurality of folds; wherein the plurality of folds culminate in a point at a front of the covering apparatus above the elongated band; wherein the elastic member is located at a rear of the covering apparatus; and wherein the covering apparatus is a shower cap.  Therefore, the Kitsch Shower Caps infringe the '930 Patent.

33.    Kitsch knowingly, actively induced and continues to knowingly, actively induce (or is willfully blind to the) infringement of the D'792 Patent and the '930 Patent within this district by making, using, offering for sale, and selling infringing products, as well as by contracting with others to use, market, sell, and offer to sell infringing products, all with knowledge of the D'792 Patent and the '930 Patent, and their claims, with knowledge that their customers will use, market, sell, and offer to sell infringing products in this district and elsewhere in the United States, and with the knowledge and specific intent to encourage and facilitate infringing sales and use of the products by others within this district and the United States by creating and disseminating promotional and marketing materials, instructional materials, and product manuals, and technical materials related to the infringing products.

## ACTUAL CONSUMER CONFUSION

34.    On information and belief, the relevant consumer public has experienced and continues to experience actual confusion about the connection or association between the Kitsch Shower Caps and Deejayzoo.

35.    Representatives from Deejayzoo have received questions regarding an apparent affiliation between Deejayzoo and the Kitsch Shower Caps based on the packaging for and sale of the Kitsch Shower Caps.

36.    Deejayzoo is aware of images posted on social media of the Kitsch Shower Caps in which the post indicated a belief that the Kitsch Shower Caps were affiliated with Deejayzoo.

## COUNT I

### (Federal Trademark Infringement – 15 U.S.C. § 1114(1))

37.    Deejayzoo repeats and realleges each and every allegation of paragraphs 1 through 36 above.

38.    Deejayzoo's federally registered THE SHOWER CAP REINVENTED Mark is presumed to have acquired distinctiveness and continues to acquire further substantial distinctiveness and goodwill in the marketplace through Deejayzoo's use of that mark in commerce.  As a result of Deejayzoo's widespread and continuous use of the THE SHOWER CAP REINVENTED Mark, the THE SHOWER CAP REINVENTED Mark has become associated in the minds of the relevant purchasing public with Deejayzoo. The reputation and goodwill that Deejayzoo has built-up in its THE SHOWER CAP REINVENTED Mark is of great value to Deejayzoo.

39.    Kitsch's sale of shower caps under the THE SHOWER CAP REINVENTED Mark, as described herein, is likely to have caused and is likely to cause confusion, mistake and/or deception among the relevant public, including consumers, as to the affiliation, connection, or association between the Kitsch Shower Cap product and the Deejayzoo SHHHOWERCAP product, and/or mislead the public into thinking that Deejayzoo is the origin of, has sponsored, or has approved of Kitsch's products and/or commercial activities.  Kitsch's actions irreparably harm the value of Deejazoo's THE SHOWER CAP REINVENTED Mark and injure Deejayzoo's reputation and goodwill.

40.    Kitsch's actions, as described above, are likely to cause confusion, or to cause mistake or to deceive consumers as to the origin, sponsorship or approval of Kitsch's products in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

41.    Kitsch created, adopted and used in commerce the confusingly similar designation THE SHOWER CAP, REINVENTED with full knowledge of Deejayzoo's

rights in the THE SHOWER CAP REINVENTED Mark. The sale and promotion of shower caps under the Counterfeit Mark has been made in bad faith and with a willful and deliberate intent to pass off Kitsch's shower caps as those of Deejayzoo, and trade on the significant goodwill developed in the THE SHOWER CAP REINVENTED Mark. In view of the willful nature of Kitsch's activities, this is an exceptional case within the meaning of 15 U.S.C. § 1117(a).

42.    Kitsch's infringement has damaged Deejayzoo, has resulted in unjust enrichment to Kitsch, and has caused and will continue to cause, unless enjoined by this Court, substantial and irreparable damage and injury to Deejayzoo and the public, for which damage and injury Deejayzoo has no adequate remedy at law.

## COUNT II

### (Federal Unfair Competion – 15 U.S.C. § 1125(a))

43.    Deejayzoo repeats and realleges each and every allegation of paragraphs 1 through 42 above.

44.    Kitsch's actions, as described above, constitute a false designation of origin, or a false representation, which wrongfully and falsely designates the origin of the Kitsch Shower Cap as originating from or being approved by Deejayzoo, and thereby constitutes false description or representation used in interstate commerce in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

45.    Kitsch's acts have caused, and unless and until such acts are enjoined by this Court pursuant to 15 U.S.C. § 1116, will continue to cause, great and irreparable injury to Deejayzoo.

46.    Deejayzoo has no adequate remedy at law.

47.    By virtue of its acts, Kitsch has violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

## COUNT III

### (Counterfeit of THE SHOWER CAP REINVENTED Mark – 15 U.S.C. § 1114)

48.    Deejayzoo repeats and realleges each and every allegation of paragraphs 1

through 47 above.

49.    Deejayzoo owns a valid United States Trademark Registration for the THE SHOWER CAP REINVENTED Mark, as set forth above.

50.    Well before any of Kitsch's actions complained of herein were committed, Deejayzoo had continuously used the THE SHOWER CAP REINVENTED Mark throughout the United States in connection with its SHHHOWERCAP products.

51.    Kitsch uses a non-genuine version of the THE SHOWER CAP REINVENTED Mark that is essentially identical to, or substantially indistinguishable from, the THE SHOWER CAP REINVENTED Mark.

52.    Kitsch's use of the Counterfeit Mark without consent from Deejayzoo is a willful and intentional infringement of Deejayzoo's THE SHOWER CAP REINVENTED Mark.

53.    Kitsch has profited from its acts of infringement. Deejayzoo is entitled to recover Kitsch's profits arising from the infringement, any damages sustained by Deejayzoo arising from said infringement, and the costs of this action. Deejayzoo also is entitled to an enhanced award of profits and/or damages to fully and adequately compensate it for Kitsch's infringement.  At its election, Deejayzoo also is entitled to statutory damages.

54.    Kitsch has caused and, unless enjoined by this Court, will continue to cause irreparable injury to Deejayzoo that is not fully compensable in monetary damages. Deejayzoo is therefore entitled to a permanent injunction enjoining and restraining Kitsch from use of the THE SHOWER CAP REINVENTED Mark or any mark that is confusingly similar to the THE SHOWER CAP REINVENTED Mark.

## COUNT IV

### (Unfair Competition under California Business and
### Professions Code §§ 17200 *et seq.*)

55.    Deejayzoo repeats and realleges each and every allegation of paragraphs 1 through 54 above.

56.    The above-described conduct of Kitsch constitutes unlawful and unfair competition in violation of California Business & Professions Code §§ 17200 et seq. (the "UCL"), in that such acts were and are unlawful, unfair, deceptive and/or fraudulent business acts.

57.    Kitsch's actions as alleged above violate the "unfair" prong of the UCL because, on information and belief, (a) the utility of such actions is outweighed by the gravity of harm they cause to Deejayzoo, (b) such actions are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers, (c) such actions constitute incipient violations of state and federal antitrust laws, and/or (d) such actions violate Section 5 of the FTC Act.

58.    Kitsch's actions as alleged above violate the "fraudulent" prong of the UCL, because they are likely to mislead and confuse a statistically significant percentage of reasonable consumers.

59.    Kitsch's actions as alleged above violate the "unlawful" prong of the UCL because those same actions also constitute violations of the state and federal statutes set forth in this Complaint.

60.    As the direct and proximate result of Kitsch's wrongful conduct, Deejayzoo has suffered and will continue to suffer actual injury and the loss of money, including irreparable injury to its reputation and goodwill. Unless enjoined, Kitsch's wrongful conduct will continue to cause great, immediate and irreparable injury to Deejayzoo.

61.    Deejayzoo is without an adequate remedy at law.

62.    Deejayzoo is therefore entitled to injunctive relief, pursuant to California Business and Professions Code § 17203.

## <u>COUNT V</u>

## **(Infringement of U.S. Patent No. D775,792 – 35 U.S.C. § 271)**

63.    Deejayzoo repeats and realleges each and every allegation of paragraphs 1 through 62 above.

64.    Deejayzoo is the owner of the D'729 Patent and has the right to sue for

infringement of the D'729 Patent.

65.    The D'729 Patent is valid and enforceable.

66.    Deejayzoo has virtually marked its Shhhowercap products as practicing the D'729 Patent, in compliance with 35 U.S.C. § 287, at https://www.shhhowercap.com/patents.

67.    Kitsch has directly infringed and continues to directly infringe the D'729 Patent within the meaning of 35 U.S.C. § 271(a) by making, using, selling, offering to sell, and importing shower caps that include the design illustrated and claimed in the D'729 Patent, including at least the following products:

• Luxe Shower Cap – Floral;

• Luxe Shower Cap – Blush Dot;

• Luxe Shower Cap – Palm Leaves;

• Luxe Shower Cap – Black;

• Luxe Shower Cap – Black and White Stripe; and

• Kayley Melissa X Kitsch Shower Cap.

68.    Kitsch has induced infringement of and continues to induce infringement of the D'729 Patent within the meaning of 35 U.S.C. § 271(b) by selling or otherwise providing shower caps that include the design illustrated and claimed in the D'729 Patent to customers with knowledge that such customers will sell or use such shower caps, and with the intent that such sales or use will infringe the D'729 Patent.

69.    The Kitsch Shower Cap bears a striking resemblance to the design disclosed and claimed in the D'729 Patent, as illustrated below.

| D'729 Patent | Kitsch Shower Cap |
|---|---|
|  | |

70.     In the eye of an ordinary observer, giving such attention as a purchaser usually gives, the design of the Kitsch Shower Cap is substantially the same as the design illustrated and claimed in the D'729 Patent.

71.     Upon information and belief, Kitsch's infringing activities have damaged Deejayzoo in an amount to be proven at trial.  Among other remedies, Deejayzoo is entitled to Kitsch's total profit from sales of the Kitsch Shower Cap under 35 U.S.C. § 289, or to Deejayzoo's lost profits or a reasonable royalty to adequately compensate Deejayzoo for Kitsch's infringing activities under 35 U.S.C. § 284.

72.     Additionally, the harm to Deejayzoo is not fully compensable by money damages. Deejayzoo has suffered and continues to suffer irreparable harm that has no adequate remedy at law and that will continue unless the infringing conduct by Kitsch is enjoined.

73.     Upon information and belief, Kitsch acted in an objectively reckless manner with respect to Deejayzoo's patent rights. Upon information and belief, Kitsch made, used, sold, and offered for sale its infringing shower cap products knowing that it was highly likely that its acts would constitute infringement of a valid patent.  Kitsch knew, or

should have known, that its actions were highly likely to result in the infringement of a valid patent. As a consequence, Kitsch has engaged in willful infringement of the patents-in-suit and Deejayzoo is therefore entitled to treble damages and attorneys' fees as well as costs incurred in this action along with prejudgment interest under 35 U.S.C. §§ 284 and 285.  Kitsch's infringement of the D'729 Patent has been willful since no later than July 19, 2018, when Kitsch was placed on actual notice of its infringement.

## COUNT VI

### (Infringement of U.S. Patent No. 10,021,930 – 35 U.S.C. § 271)

74.    Deejayzoo repeats and realleges each and every allegation of paragraphs 1 through 73 above.

75.    Deejyzoo is the owner of the '930 Patent and has the right to sue for infringement of the '930 Patent.

76.    The '930 Patent is valid and enforceable.

77.    Kitsch has infringed and continues to infringe at least claims 1, 3, 5, 6, and 7 of the '930 Patent within the meaning of 35 U.S.C. § 271(a) by making, using, selling, offering to sell, and importing the Kitsch Shower Cap, including at least the following variants of the Kitsch Shower Cap:

- Luxe Shower Cap – Floral;
- Luxe Shower Cap – Blush Dot;
- Luxe Shower Cap – Palm Leaves;
- Luxe Shower Cap – Black;
- Luxe Shower Cap – Black and White Stripe; and
- Kayley Melissa X Kitsch Shower Cap.

78.    The Kitsch Shower Cap is a covering apparatus that is a shower cap and that comprises a grip, a gathered band, and an elongated band, as annotated below.  The gathered band and the elongated band are of a unitary construction and are attached to a periphery of the covering apparatus.



79.    The Kitsch Shower Cap comprises a unitary material.  The unitary material comprises an outer layer and an inner layer, as annotated above.  According to laboratory testing, the outer layer comprises a fabric and is water repellent.  According to laboratory testing, the inner layer is polyurethane.

80.    The Kitsch Shower Cap comprises an elastic member enclosed within the gathered band.  Like the gathered band, the elastic member is located at a rear of the covering apparatus.

81.    The Kitsch Shower Cap comprises a plurality of folds that culminate in a



Counterclaims to First Amended Complaint

1    point at a front of the covering apparatus above the elongated band, as annotated below.

2    82.    The grip of the Kitsch Shower Cap is stitched, bonded or piped to an inner

3    portion of the covering apparatus.

4    83.    On information and belief, the Kitsch Shower Cap is knit or woven.

5    84.    On information and belief, the Kitsch Shower Cap is antimicrobial or

6    breathable.

7    85.    On information and belief, the grip of the Kitsch Shower Cap comprises at

8    least one of rubber, fabric, or neoprene.

9    86.    Kitsch has infringed and continues to infringe claim 2 of the '930 patent

10   within the meaning of 35 U.S.C. § 271(a) by making, using, selling, offering to sell, and

11   importing the Kitsch Shower Cap, including at least the following variants of the Kitsch

12   Shower Cap (collectively, the "Kitsch Patterned Shower Caps"):

13       •    Luxe Shower Cap – Floral;

14       •    Luxe Shower Cap – Blush Dot;

15       •    Luxe Shower Cap – Palm Leaves;

16       •    Luxe Shower Cap – Black and White Stripe; and

17       •    Kayley Melissa X Kitsch Shower Cap.

18   87.    On information and belief, the unitary material of the Kitsch Patterned

19   Shower Caps comprises a plurality of digitally sublimated designs.

20   88.    Kitsch has induced infringement of and continues to induce infringement of

21   claims 1-3 and 5-7 of the '930 Patent within the meaning of 35 U.S.C. § 271(b) by selling

22   or otherwise providing the Kitsch Shower Cap to customers with knowledge that such

23   customers will sell or use such shower caps, and with the intent that such sales or use will

24   infringe the '930 Patent.

25   89.    Upon information and belief, Kitsch's infringing activities have damaged

26   Deejayzoo in an amount to be proven at trial.  Among other remedies, Deejayzoo is

27   entitled to Deejayzoo's lost profits, and in no event less than a reasonable royalty, to

28   adequately compensate Deejayzoo for Kitsch's infringing activities under 35 U.S.C.

§ 284.

90.   Additionally, the harm to Deejayzoo arising from these acts by Kitsch is not fully compensable by money damages. Deejayzoo has suffered and continues to suffer irreparable harm that has no adequate remedy at law and that will continue unless the infringing conduct by Kitsch is enjoined.

91.   Upon information and belief, Kitsch acted in an objectively reckless manner with respect to Deejayzoo's patent rights. Upon information and belief, Kitsch made, used, sold, and offered for sale its infringing shower cap products knowing that it was highly likely that its acts would constitute infringement of a valid patent.  Kitsch knew, or should have known, that its actions were highly likely to result in the infringement of a valid patent. As a consequence, Kitsch has engaged in willful infringement of the patents-in-suit and Deejayzoo is therefore entitled to treble damages and attorneys' fees as well as costs incurred in this action along with prejudgment interest under 35 U.S.C. §§ 284 and 285.  Kitsch's infringement of the '930 Patent has been willful since no later than July 19, 2018, when Kitsch was placed on actual notice of its infringement.

## PRAYER FOR RELIEF

WHEREFORE, Deejayzoo respectfully requests this Court to enter judgment against Kitsch, granting the following relief:

A.   The entry of judgment in favor of Deejayzoo and against Kitsch on all Counterclaims;

B.   Designate this action as an exceptional case entitling Deejayzoo to an award of its reasonable attorney's fees incurred as a result of this action, pursuant to 15 U.S.C. § 1117;

C.   Issue preliminary and permanent injunctive relief against Kitsch and its officers, agents, representatives, servants, employees, attorneys, successors and assigns, and all others in active concert or participation with Kitsch, enjoining and restraining them from:

(i) imitating, copying, or making any other infringing use of the THE

SHOWER CAP REINVENTED Mark by the Counterfeit Mark, and any other mark now or hereafter confusingly similar to the THE SHOWER CAP REINVENTED Mark;

(ii) manufacturing, assembling, producing, distributing, offering for distribution, circulating, selling, offering for sale, advertising, importing, promoting, or displaying any simulation, reproduction, counterfeit, copy, or colorable imitation of the THE SHOWER CAP REINVENTED Mark, the Counterfeit Mark, or any mark confusingly similar thereto;

(iii) engaging in any other activity constituting an infringement of the THE SHOWER CAP REINVENTED Mark; and

(iv) assisting, aiding, or abetting any other person or business entity engaging in or performing any of the activities referred to in subparagraphs (i) through (iii) above;

D.    Order Kitsch, at its own expense, to recall all products and marketing, promotional, and advertising materials that bear or incorporate the Counterfeit Mark, or any mark confusingly similar to the THE SHOWER CAP REINVENTED Mark, which have been manufactured, distributed, sold, or shipped by Kitsch or on its behalf, and to reimburse all customers from which said materials are recalled.

E.    Order Kitsch to immediately produce and turn over to Deejayzoo's counsel, all products, labels, signs, prints, packages, molds, plates, dies, wrappers, receptacles, and advertisements in its possession or under its control, bearing the Counterfeit Mark, and/or any simulation, reproduction, copy, or colorable imitation thereof, and all plates, molds, matrices, and any other means of making the same.

F.    Order Kitsch to pay the general, special, actual, and statutory damages of Deejayzoo as follows:

(i) Deejayzoo's damages and Kitsch's profits pursuant to 15 U.S.C. § 1117(a), trebled pursuant to 15 U.S.C. § 1117(b) for Kitsch's willful violation of the federally registered trademark of Deejayzoo; and

1           (ii) If Deejayzoo so elects, statutory damages of up to $2,000,000 per

2           counterfeit mark, per type of product sold, offered for sale, or distributed,

3           pursuant to 15 U.S.C. § 1117(c);

4     G.    An award of damages adequate to compensate Deejayzoo for the patent

5 infringement that has occurred, and in no event less that a reasonable royalty, as permitted

6 by 35 U.S.C. § 284, together with prejudgment interest;

7     H.    Designate this action as an exceptional case, increase the award of damage to

8 Deejayzoo by three times, and award Deejayzoo its reasonable attorney' fees incurred as a

9 result of this action pursuant to 35 U.S.C. § 285.

10     I.    Such other and further relief as the Court deems just and proper.

11 DATED: May 10, 2019           GREENBERG TRAURIG, LLP

12

13                  By */s/ Matthew R. Gershman*

14                      *Attorneys for Defendant*

15                      *Deejayzoo, LLC*

16

17                 **DEMAND FOR JURY TRIAL**

18     Counterclaim Plaintiff Deejayzoo, LLC demands a jury trial on all issues triable by

19 jury.

20 DATED: May 10, 2019           GREENBERG TRAURIG, LLP

21

22                  By */s/ Matthew R. Gershman*

23                      *Attorneys for Defendant*

                     *Deejayzoo, LLC*

24

25

26

27

28

EXHIBIT "2"



**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

*Kitsch LLC, Plaintiff/Counter–Defendant vs.*

*DEEJAYZOO, LLC, Defendant/Counter–Plaintiff*

*Case No. 2:19-cv-02556, U.S.District Court, CDCA*

# 2022 Update to the

# Expert Damages Report of Fernando Torres, MSc.

Submitted to:

John Shaeffer,
Meeghan H. Tirtasaputra
Fox Rothschild LLP
10250 Constellation Blvd. Suite 900
Los Angeles, CA 90067
Tel. (424) 285-7080

*Attorneys for Defendant Deejayzoo, LLC*

Submitted by



9320 Chesapeake Drive, Suite 110
San Diego, CA  92123
858.538.1533

June 22, 2022

© IPmetrics, LLC – CONFIDENTIAL – Dissemination is subject to the Court's Protective Order

IPmetrics®
Intellectual Property Consulting

HIGHLY CONFIDENTIAL – Attorney's Eyes Only

Kitsch LLC v. Deejayzoo LLC                                Expert Damages Report
June 22, 2022                                                      Page i

## TABLE OF CONTENTS

1.  INTRODUCTION ................................................................................................................. 1

2.  QUALIFICATIONS ............................................................................................................. 1

3.  CASE BACKGROUND ....................................................................................................... 2

4.  DAMAGES ANALYSIS ...................................................................................................... 3

    A.   GENERAL CONSIDERATIONS ........................................................................................... 3

    B.   PATENT INFRINGEMENT DAMAGES ................................................................................. 4

         Lost Profits Analysis ............................................................................................... 5

         Reasonable Royalty Analysis .................................................................................. 6

    C.   DESIGN PATENT INFRINGEMENT DAMAGES ................................................................... 8

    D.   TRADEMARK INFRINGEMENT DAMAGES ...................................................................... 11

         Corrective Advertising .......................................................................................... 12

5.  SUMMARY OF OPINIONS ............................................................................................. 13

    APPENDICES .................................................................................................................... 16

HIGHLY CONFIDENTIAL – Attorney's Eyes Only

Kitsch LLC v. Deejayzoo LLC                Expert Damages Report
June 22, 2022                                    Page 1

# 1. INTRODUCTION

Counterclaim Plaintiff Deejayzoo, LLC ("Deejayzoo") retained IPmetrics® LLC ("IPmetrics"), to provide intellectual property consulting expert services in relation to economic damages attributable to the alleged conduct of Counterclaim Defendant Kitsch LLC ("Kitsch") in the following matter: *Kitsch LLC (Plaintiff/Counter–Defendant) vs. DEEJAYZOO, LLC (Defendant/Counter– Plaintiff).*[1]  I, Fernando Torres, authored an Expert Damages Report which was submitted in this case on September 18, 2020.  As of June 8, 2022, I have been asked by Deejayzoo's counsel to prepare the present update to the report, reflecting new infringing sales information produced by Kitsch. Consequently, I have updated the analysis, as well as the consequent opinions, as appropriate.

# 2. QUALIFICATIONS

I, Fernando Torres, am a professional economist and have over 30 years of experience in applied and theoretical economics. In the course of this experience, I have been a consultant, a professor, and a business manager. Both my undergraduate and post-graduate degrees are in economics, the latter with a concentration in econometrics. For the past fifteen years, I have specialized in the analysis and valuation of intellectual property and intangible assets. Since 2010, I have been a member and Chief Economist of IPmetrics LLC, an intellectual property consulting firm.

I have undertaken projects involving the valuation and/or the assessment of infringement damages regarding patents, trademarks, copyrights, trade secrets, rights of publicity, and other intangible assets in a wide array of industries. I have

---

[1] Case No. 2:19-cv-02556, US District Court, Central District of California (Western Division), Defendant's First Amended Counterclaims to First Amended Complaint for Declaratory Judgment and Demand for Jury Trial, filed June 3, 2020.

HIGHLY CONFIDENTIAL – Attorney's Eyes Only

Kitsch LLC v. Deejayzoo LLC                    Expert Damages Report
June 22, 2022                                           Page 2

authored publications on intellectual property topics, including the value of patents, and have given presentations on valuation and damages issues to industry groups and law firms.

As required by Federal Rule of Civil Procedure, Rule 26(a)(2)(B), attached as Appendix A is a current copy of my curriculum vitae detailing my qualifications and including my recent experience as an expert witness. Appendix B lists the documents considered in forming my opinions in this case, and Appendix C details the compensation arrangements.

## 3. CASE BACKGROUND

In July 2018, Deejayzoo's counsel wrote to Kitsch's management regarding their view that Kitsch's shower cap products were infringing the intellectual property rights of Deejayzoo,[2] namely:

- Registered Trademark
  - "THE SHOWER CAP REINVENTED" (Reg. Num. 5,208,472)[3]
- Utility Patent
  - "Noise Reducing Water Resistant Headpiece" (Num.10,021,930 B2)[4]
- Design Patent
  - "Noise Reducing Water Resistant Headwear Cap" (Num. D775,792)[5]

By April 2019, Plaintiff Kitsch filed a Complaint for Declaratory Judgment against Defendant Deejayzoo [6] seeking declarations of non-infringement and invalidation of the registrations identified above.[7]

---

[2] See: Complaint, at §23 (Exhibit 4 to the Complaint).
[3] Registration dated May 23, 2017, in International Class 25 covering "Waterproof headpieces, namely, shower caps and turbans." With a first use in commerce on July 11, 2016 (USPTO.gov/TESS).
[4] US Patent issued July 17, 2018 (USPTO.gov/pair/PublicPair).
[5] US Design Patent issued January 10, 2017 (USPTO.gov/pair/PublicPair).

IPmetrics®
Intellectual Property Consulting

HIGHLY CONFIDENTIAL – Attorney's Eyes Only

In July 2020, Deejayzoo filed First Amended Counterclaims (FACC)[8] to the Second Amended Complaint for Declaratory Judgment[9]. The September 18, 2020, damages report addressed the quantification of damages alleged in the FACC.

The present update considered the updated accused sales information produced by Kitsch with data through the end of March 2022.[10]

## 4. DAMAGES ANALYSIS

For the purposes of assessing economic damages, a first necessary assumption is that liability for the alleged tort will have been found by the trier of fact. Under that assumption, the quantification of the award of damages adequate to compensate the Counter-Plaintiff for the alleged infringements becomes relevant.

### A. General Considerations

Economic damages, such as those stemming from the allegations in this case, can typically be measured by comparing the actual results the Counterclaimant's business has attained (the "Actual Scenario"), with the results that would have been reasonably expected, given the provisions of patent and trademark law and general economic conditions, but for the infringing acts and conduct alleged in this case (the "But For Scenario"). Since the allegations refer to three distinct types of intellectual property rights, each type is analyzed separately,

---

[6] Complaint, filed on April 4, 2019.
[7] See "Prayer for Relief" in Complaint, *op cit.* p 10.
[8] First Amended Counterclaims, filed July 1, 2020.
[9] Filed June 17, 2020.
[10] Specifically, the document titled "Accused Showercap Profit Analysis with Units-C" including sales by year through March 2022.

although the monetary recovery concepts are similar, the damages award is not intended to be duplicative.

Furthermore, in this report update, only the direct and consequent effects of the new infringing sales information is addressed, while the bases, considerations, and other information remains as initially reported.

## B. Patent Infringement Damages

With respect to the calculation of appropriate damages from the infringement of a utility patent, the relevant statute indicates that: "Upon finding for the claimant, the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." [11] For utility patents, damages are calculated as lost profits, stemming from lost sales, eroded prices, and/or increased expenses, or as a reasonable royalty.

The appliable damages period in this regard begins as early as on the date of issue of the patent which, in this case, is July 17, 2018,[12] and is ongoing as, I understand, the Kitsch shower caps have not been re-designed nor their sale discontinued. In principle, the damages period

---

[11] 35 USC §284.
[12] Per USPTO (Pat. 10,021,930 B2). Since this date falls within six years prior to the filing of the Counterclaim (Initially filed May 10, 2019 – Doc. No. 17), the statutory limitation does not further limit the damages period (35 USC §286).



HIGHLY CONFIDENTIAL – Attorney's Eyes Only

Kitsch LLC v. Deejayzoo LLC                          Expert Damages Report
June 22, 2022                                               Page 5

may extend through the anticipated statutory expiration date of the patent at issue, which is December 26, 2034.[13]

HIGHLY CONFIDENTIAL – Attorney's Eyes Only

Kitsch LLC v. Deejayzoo LLC

Expert Damages Report

June 22, 2022

Page 6





HIGHLY CONFIDENTIAL – Attorney's Eyes Only

Kitsch LLC v. Deejayzoo LLC
June 22, 2022

Expert Damages Report
Page 7



---

[20] 35 USC §284.
[21] Original Report, pp 27-29.
[22] ████████████████████████████████████
[23] Based on infringing sales as of March 31, 2022.

HIGHLY CONFIDENTIAL – Attorney's Eyes Only

Kitsch LLC v. Deejayzoo LLC                    Expert Damages Report
June 22, 2022                                  Page 8

**IPmetrics**
Intellectual Property Consulting

## C. Design Patent Infringement Damages

The statute referring to design patent infringement damages states that: "[the infringer] shall be liable to the [design patent] owner to the extent of his total profit, but not less than $250."[24] This has recently clarified by the Supreme Court[25] in the sense that, design patent damages involve two steps:

1) To identify the 'article of manufacture' to which the infringed design has been applied; and

2) To calculate the infringer's total profit made on that article of manufacture.

In the original report,[26] I opined that, in this case, the applicable damages in this regard would be Kitsch's total profit from the infringing shower caps.[27]

Based on the information available, for this update, Kitsch has provided a breakdown of the applicable Gross Profit[28] it has made on the alleged infringing sales. Summarized by year, these gross profits and their proportion to sales are shown in the following table.

---

[24] 35 USC §289.

[25] *Samsung v. Apple,* 137 S.Ct. 429 (2016) No. 15-777, was decided by the Supreme Court on December 6, 2016, on appeal from the Northern District of California.

[26] Original Report, pp 30-33.

[27] The Federal Circuit has noted that "the Act of 1887, specific to design patents removed the apportionment requirement when recovery of infringer's profits was sought," and "the additional remedy created in 1887 for design patents was enacted to overcome the allocation problem for designs." In *Nike, Inc. v. Wal-Mart Stores, Inc.,* 138 F.3d 1437, 1441, 46 U.S.P.Q.2d 1001 (Fed. Cir. 1998).

[28] For clarity, this is a measure of Profit after deducting the direct Cost of Goods Sold, only.



HIGHLY CONFIDENTIAL – Attorney's Eyes Only

Kitsch LLC v. Deejayzoo LLC                         Expert Damages Report
June 22, 2022                                       Page 9



---

[29] Based on the spreadsheet report titled "Invoice Item Gross Profit Analysis Report by YEAR - HC - AEO" showing units and amounts from Shower Cap Sales between 6/1/2016 and 8/21/2020. Updated with information in the document titled "Accused Showercap Profit Analysis with Units-C" including sales by year through March 2022.
[30] Original Report, pp 32-33.

© IPmetrics, LLC – CONFIDENTIAL – Dissemination is subject to the Court's Protective Order

HIGHLY CONFIDENTIAL – Attorney's Eyes Only

Kitsch LLC v. Deejayzoo LLC                    Expert Damages Report

June 22, 2022                                                    Page 10





HIGHLY CONFIDENTIAL – Attorney's Eyes Only

Kitsch LLC v. Deejayzoo LLC                     Expert Damages Report
June 22, 2022                                          Page 11

**D.  Trademark Infringement Damages**

As in the Original Report, different measures of the damages concepts applicable to trademark infringement have been calculated in the preceding sections. Specifically, Defendant's profits have been calculated at ▮▮▮▮▮▮ specifically associated with the sale of Infringing Products during the period from 2018 through March 31, 2022.

Damages sustained by the Plaintiff have been partly calculated as Lost Profits considering the different price points at which each party sells the products at issue, ▮▮▮▮▮▮ while damages corresponding to the

**IPmetrics**
Intellectual Property Consulting

remaining infringing sales can be to be calculated by a Reasonable Royalty applicable to trademarks, ███ as concluded in the Original Report.[33]

On this basis, I estimated the following reasonable royalties for the use of Deejayzoo's marks in Kitsch's shower cap product line. Since the trademark and utility patent royalty rates coincide numerically, the Reasonable Royalty on the infringing sales not covered in the Lost Profits calculation is equivalent to the amount determined above in Table 2: ███████

### **Corrective Advertising**

The updated data does not disclose the specific amounts of Advertising and Promotion expenses deployed to support the sales of the accused product line. Therefore, as an indication of advertising spend, I applied the ███ advertising-to-sales ratio for Kitsch as a whole, from the Original Report,[34] to the updated infringing sales ████████
███████

The amount calculated represents the economic cost of generating the allegedly false impression that Kitsch's products are the products consumers know or expect to be the SHHHOWERCAP™, THE SHOWER CAP REINVENTED®. To correct this mistaken impression, the standard calculation, rather than countering the advertising dollar-for dollar, refers to the Federal Trade Commission's practice in handling corrective advertising in false advertising matters, namely, measuring the

---

[33] Original Report, pp 36-37.
[34] Original Report, pp 38-39 (calculated based on 2018-2019 financials).

IPmetrics
Intellectual Property Consulting

HIGHLY CONFIDENTIAL – Attorney's Eyes Only

Kitsch LLC v. Deejayzoo LLC                                    Expert Damages Report
June 22, 2022                                                          Page 13

correction needed as ████ of the amount spent. [35] Therefore, the approximate updated Corrective Advertising remedy in this case would be ███ of the estimated advertising expenditures, or ███████



---

[35] Based on: *Big O tire Dealers, Inc. v. Goodyear Tire & Rubber Co., 4048 F. Supp. 1219, 1231, 189 U.S.P.Q. 17 (D. Colo. 1976)*.
[36] Based on sales Deejayzoo would make in the 'but for' scenario.
[37] Applied on the infringing sales in excess of those Deejayzoo would make in the 'but for' scenario.



HIGHLY CONFIDENTIAL – Attorney's Eyes Only

Kitsch LLC v. Deejayzoo LLC                          Expert Damages Report

June 22, 2022                                        Page 14

---

[38] Not both as they are based on the same sales.
[39] Based on sales Deejayzoo would make in the 'but for' scenario.
[40] Applied on the infringing sales in excess of those Deejayzoo would make in the 'but for'
scenario.

© IPmetrics, LLC – CONFIDENTIAL – Dissemination is subject to the Court's Protective Order



HIGHLY CONFIDENTIAL – Attorney's Eyes Only

Kitsch LLC v. Deejayzoo LLC                    Expert Damages Report
June 22, 2022                                            Page 15

These economic damages are not necessarily exhaustive. I understand the amounts calculated and presented in this report may be subject to enhanced damages, depending on the ultimate findings of the trier of fact, or other elements of damages that the court may find to be appropriate under federal law, including without limitation a finding of "exceptionality" which would entitle Counter-Plaintiff to an award of attorneys' fees.

The foregoing analysis is reliant on the current state of discovery in the case at hand. In this context, I proffer these opinions with a reasonable degree of professional certainty. In addition to my testimony at trial, I expect to rely on exhibits prepared to depict and explain the information contained in the Original and this Updated Reports or as a rebuttal to testimony by other witnesses. Any such exhibits will be prepared and identified in advance of trial.

Fernando Torres
Chief Economist,
IPmetrics LLC

HIGHLY CONFIDENTIAL – Attorney's Eyes Only

Kitsch LLC v. Deejayzoo LLC
June 22, 2022

Expert Damages Report
Page 16

# APPENDICES

**IPmetrics** Intellectual Property Consulting

# APPENDIX A

# Qualifications of Fernando Torres, MSc

Fernando Torres is an intellectual property economist with 30 years of work experience in economics, financial analysis, and business management in the U.S. and Mexico. He is a member and Chief Economist at IPmetrics LLC, an IP consulting firm specializing in the strategic analysis, valuation, and expert witness assessment of the full spectrum of intangible assets.

Since 2004, Mr. Torres has applied his economics, finance, and business experience, as well as skills in quantitative techniques, to the analysis and valuation of intangible assets, including valuation for transactional and litigation purposes (bankruptcy and infringement cases). Prior to joining IPmetrics, Mr. Torres served as Senior Economist at CONSOR® Intellectual Asset Management.

During recent years, Mr. Torres has undertaken projects involving the valuation and/or the assessment of infringement damages regarding copyrights, trademarks, patents, trade secrets, rights of publicity, and other intellectual assets in such industries as commercial agriculture, auto parts, apparel and footwear, retail, pharmaceuticals, entertainment, telecommunications, and non-profit organizations, among others.

Mr. Torres regularly presents on topics related to intangible asset valuation in a variety of venues, many of which qualify for CLE credit. During the past few years, Mr. Torres has been an instructor for the course "Valuing Intangible Assets for Litigation," which is part of the requirements of the Certified Forensic Financial Analyst designation issued by the National Association of Certified Valuation Analysts (NACVA).

HIGHLY CONFIDENTIAL – Attorney's Eyes Only

**IPmetrics**
Intellectual Property Consulting

Kitsch LLC v. Deejayzoo LLC                Expert Damages Report
June 22, 2022                                          Page 18

Mr. Torres has been particularly active in the area of the copyright and rights of publicity infringement issues, encompassing from the unlicensed use of celebrity images to a class action lawsuit against the major social networking site.

Mr. Torres is also the editor and author of the online Patent Value Guide and his perspectives on the value of patents and other intellectual property assets have been cited in the media, including Managing Intellectual Property, The New York Times, Forbes.com, Business News Network, Business Valuation Resources, and The Democrat & Chronicle.

Mr. Torres is a member of the National Association of Forensic Economics, and of the Western Economics Association International, among others. His career has spanned from academia, to branches of government, to private industry and consulting.

He first earned a B.A. in Economics from the Metropolitan University in Mexico City (1980) and went on to earn a Graduate Diploma in Economics from the University of East Anglia (U. K., 1981), and a Master of Science Degree specializing in Econometrics from the University of London, England (1982).

Prior to specializing in IP, his career centered on financial analysis and management in the private sector, having been both a brand development consultant and an entrepreneur in several business ventures, mainly in computer services and the health care industry. During the 1980s, Mr. Torres was Professor of Economics at the Metropolitan University in Mexico City, teaching Economic Policy, Economic Growth, Microeconomics, and Quantitative Methods. Mr. Torres was later a financial consultant (NASD Series 7, 63, 65) for half a dozen years with AXA Advisors LLC.



**PROFESSIONAL ASSOCIATIONS**

- National Association of Forensic Economics
- American Economic Association
- International Trademark Association
- Western Economics Association International

**SPEECHES AND PRESENTATIONS**

- "Topics on Technology & Innovation" Session Chair, Western Economics Association International 82nd Annual Conference – San Diego, CA; June 2017

- "Discussion: Benchmarking Against Industry Data Over Time," Western Conference of the National Association of Forensic Economics; San Diego, CA; June 2017

- "Bitcoin: What it is and what it can be." The 1230 Club, La Jolla, CA, June 29, 2016

- "Valuing Intangibles: From Search to Valuation" CPE webinar, Business Valuation Resources Inc., April 2016.

- "What is a Brand Worth?" MCLE webinar, The State Bar of California, Trademark Interest Group, March 2015.

- "Intellectual Property Valuation Techniques," CLE presentation to Pillsbury Winthrop Shaw Pittman LLP, San Diego, CA, August 2014

- "10 Common Mistakes in IP Valuation/Damages", CLE presentation to Jeffer Mangels Butler & Mitchell LLP, Los Angeles, CA, July 2014.

- "Intellectual Property Valuation Techniques," MCLE presentation, San Diego, CA, April 2013

- "Intellectual Property Valuation and Monetization," a seminar for the Special American Business Internship Training (SABIT) Intellectual Property Rights program, U.S. Department of Commerce. March 2013.

- "Recent Developments in Intellectual Property Economic Damages," Presentation at the Annual Conference of the National Association of Forensic Economics. June 2011.

- "Valuing the Intangible: Where to Start?" CLE presentation to Sheppard Mullin Richter & Hampton, LLP. December 2009.

- "Defending and Enforcing Your Technology." Panelist at: Foley's Emerging Technologies Conference: Navigating a New World – San Diego, CA (Foley & Lardner LLP); September 2009.

- "Intellectual Property Valuation, Monetization and Disposition in Bankruptcy" – CLE presentation at the Spring Trademark Program of the NY Intellectual Property Law Association – New York, NY; June 2009.

- "Damages Valuation and Expert Witnesses" (co-presenter) – CLE presentations to:

    - Gibson, Dunn & Crutcher LLP – Irvine, CA (June 2008)

    - Arent Fox, LLP — Washington, DC (April 2008)



- Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P. – Washington, DC (April 2008)

- "Valuing Intangible Assets for Litigation" (Instructor) – National Association of Certified Valuation Analysts (NACVA) – Fort Lauderdale, FL; December 2007

- "Valuing Intangible Assets for Litigation" (Instructor) – National Association of Certified Valuation Analysts (NACVA) – Philadelphia, PA; October 2007

- "Trademark Values in Corporate Restructuring" – Western Economics Association International 82nd Annual Conference – Seattle, WA; July 2007

- "Entrepreneurship and Innovation" (Session Chair) – Western Economics Association International 82nd Annual Conference – Seattle, WA; July 2007

- "Alternative Focuses for 'But For' Scenario Specification in Commercial Litigation" (Discussant) – National Association of Forensic Economics, Western Conference – Seattle, WA; June 2007

- "Patent Values in the Evolving I.P. Market" – Practicing Law Institute – Hot Topic Briefing Teleconference; May 2007 (CLE Presentation)

- "Key Issues in Intellectual Property Due Diligence" – Due Diligence Symposium 2007 – ACG – Iselin, NJ; April 2007

- "Life Sciences IP Due Diligence" – American Conference Institute – San Francisco, CA; January 2007

- "Developments in Patent Valuation" – Practicing Law Institute – San Francisco, CA; January 2007 (CLE Presentation)

- "Collins & Aikman Europe and Other Cross-Border Asset Sales: A Tale of Two Venues" – American Bankruptcy Institute, Winter Leadership Meeting – Phoenix, AZ; December 2006

- "Valuing Intangible Assets for Litigation" (Instructor) – National Association of Certified Valuation Analysts (NACVA) – San Diego, CA; December 2006

- "Effective IP Litigation Support and Valuation" – LeBoeuf, Lamb, Greene & MacRae, LLP – New York, NY; February 2006 (CLE Presentation)

**PUBLICATIONS**

- "Options Approach to Licensing Royalties" in: LinkedIn.com, September 3, 2019.

- "IP Value in Bankruptcy" in LinkedIn.com, August 27, 2019.

- "Why only some patents are valuable" in: IPmetrics Blog, (May 13, 2015).

- "General Principle I – Lack of Intrinsic Value" in: PatentValueGuide.com, (February 11, 2013).

- "General Principle II – Patent Use is Key to Value" in: PatentValueGuide.com, (February 8, 2013).

- "Conceptual Patent Value Framework" in: PatentValueGuide.com, (January 31, 2013).

- "The Impact of Reorganization on Trademark Values," in: IP Management and Valuation Reporter, March 2012, BVR, Portland, OR.

- "Fundamental Principles of Patent Value," in: IP Management and Valuation Reporter, January 2012, BVR, Portland, OR.

- "Key Factors of Infringement Damages Apportionment in the Java & Android Case" in: IPmetrics Blog, (December 8, 2011).

- Book Chapter: "Valuation, Monetization, and Disposition in Bankruptcy" in IP Operations and Implementation for the 21st Century Corporation, John Wiley and Sons, Inc. (November 2011).

- "Have Patent Litigation Damages Awards Been Worth It?" in: IPmetrics Blog, (April 29, 2011).

- "Celebrity Advertising and Endorsement" in: IPmetrics Blog, (March 2, 2011).

- "The Patent to Trademark Value Transition: Nespresso" IPmetrics Blog, (February 3, 2011).

- "The Liquidation Value of IP" in: IPmetrics Blog, (January 26, 2011).

- "An Econometric Model of Trademark Values" in: IPmetrics Blog, (January 25, 2011).

- Chapter 15: "Copyrights" in Wiley Guide to Fair Value Under IFRS, John Wiley and Sons, Inc. (May 2010).

- "The Road to Asia," Feature Article (co-author) in: World Trademark Review, No. 23, February/March 2010, pp. 19-22.

- "Trademark Values in Corporate Restructuring" (July 2007). Social Sciences Research Network: http://ssrn.com/abstract=1014741

- "Establishing Licensing Rates Through Options" (September 2006) Social Sciences Research Network: http://ssrn.com/abstract=1014743 and in: http://formulatorres.blogspot.com/2006_05_01_archive.html

- Book Chapter: "Ch. 9: Recent developments in Patent Valuation" in: Practicing Law Institute, Patent Law Institute 2007: The Impact of Recent Developments on Your Practice, PLI Course Handbook (March 19, 2007).

- "Establishing Licensing Rates through Options," in: ipFrontline, September 12, 2006 (http://www.ipfrontline.com/depts/article.asp?id=12586&deptid=3).

HIGHLY CONFIDENTIAL – Attorney's Eyes Only

**IPmetrics**
Intellectual Property Consulting

Kitsch LLC v. Deejayzoo LLC
June 22, 2022

Expert Damages Report
Page 22

## LITIGATION-RELATED EXPERIENCE

*(Past 4 years)*

| Dates | Parties | Case | Court | Status | Nature | Hired By | Role |
|---|---|---|---|---|---|---|---|
| Apr '16 – Oct. 2017 Abd June 2022 | *Lawn Managers, Inc. v Progressive Lawn Managers, Inc.* | 16-CV-00144 | United States District Court Eastern District of Missouri | *Pending* | Trademark Infringement | Law Offices of Norah J. Ryan | Expert Damages Report, Deposition, Trial Testimony, Updated Expert Report |
| Jan – Mar 2018 | C. Gainer v. Ketchum Group dba Outdoor Technology | 17-cv-672 | United States District Court Central District of California | *Settled* | Copyright Infringement | The Kneafsey Firm, Inc. | Expert Damages Report |
| August – Sept. 2018 | *Atelier Fashion Company, Inc. V. Amiri And Associates, et al.* | 18-cv-02308 | United States District Court Central District of California | *Settled* | Trademark Infringement | Miller Barondess, LLP | Expert Damages Report |
| Sept – Dec 2018 | *Xat.com v. Hosting services, Inc.* | 16-cv-00092 | United States District Court District of Utah | *Closed* | Contract / data breach / lost profits | Stoel Rives LLP | Expert Damages Report |
| June 2016 - Sept 2019 | *Direct Sound Headphones, LLC v. Kevin Klug* | 16SL-CC0486 | Circ. Ct. Of St. Louis County, Missouri | *Settled* | Legal Malpractice (Trademark) | The Simon Law Firm, PC / Dowd & Dowd, PC | Expert Damages Report, Deposition |
| March – May 2019 | *TEETER-TOTTER, LLC v. Palm Bay International, Inc.* | 17-Cv-06609 | US District Court for the Northern District of California | *Settled* | Trademark Infringement | Dickenson, Peatman & Fogarty LLP | Expert Damages Report |
| May – July 2019 | *JK Products LLC v. Lathrop & Gage LLP, JL Johnson Esq.* | 1731-CC01189 | Circuit Court of Greene County State of Missouri | *Settled* | Legal Malpractice (Patent) | The Simon Law Firm, PC / Dowd & Dowd, PC | Expert Damages Report |
| May – July 2019 | *Evolve Technologies v CWS Inc.* | 18-cv-00671 | US District Court for the Southern District of California | *Settled* | Patent Infringement | Patterson + Sheridan LLP | Expert Damages Report |
| July – Aug 2019 | *Happy Place, Inc. v. Hofesh, LLC, et al.* | 18-cv-06915 | US District Court for the Central District of California | *Settled* | Trademark Infringement | Pessah Law Group | Mediation Expert Damages Report |
| Sept. 2019 | *Triumphant Gold Ltd. in: Re: Rooftop Group International. Pte. Ltd.* | 19-31443-HDH11 | US Bankruptcy Court for the Northern District of Texas | *Settled* | IP Valuation | Hedrick Kring, PLLC | Declaration in Support of Opposition of Sale |

HIGHLY CONFIDENTIAL – Attorney's Eyes Only

Kitsch LLC v. Deejayzoo LLC
June 22, 2022

Expert Damages Report
Page 23

IPmetrics®
Intellectual Property Consulting

| Dates | Parties | Case | Court | Status | Nature | Hired By | Role |
|---|---|---|---|---|---|---|---|
| Nov-Dec. 2019 | *JaM Cellars, Inc.* vs. *The Wine Group LLC* | 19-cv-1878 | US District Court for the Northern District of California | *Settled* | Trademark Infringement | Dickenson, Peatman & Fogarty LLP | Expert Damages Report |
| Oct 2019 – February 2020 | *Hotel Airport International et al v. Best Western International Inc* | 19-cv-01393 | US District Court for the District of Arizona | *Settled* | Trademark Infringement | Godreau & Gonzalez Law, LLC | Expert Damages Report, Deposition |
| Dec. 2019 – March 2020 | *The Coin-Tainer Company LLC v. Pap-R Products Co. et al.* | 19-cv-00234 | United States District Court Southern District of Illinois | *Closed* | Trademark Infringement & Breach of Contract | Trepanier MacGillis Battina P.A. | Expert Damages Report, Deposition |
| Aug – Dec 2020 | *Kitsch LLC,* vs. *DEEJAYZOO, LLC* | 19-cv-02556 | US District Court for the Central District of California | *Pending* | Utility, Design Patents; Trademark Infringement | Jayaram Law, Inc. / Fox Rothschild, LLP | Expert Damages Report, Deposition |
| April – Dec. 2020 | *RG Golf Warehouse Inc.* vs. *The Golf Warehouse, Inc.* | 19-CV-0585 | US District Court for the District of Minnesota | *Pending* | Breach of Contract | Trepanier MacGillis Battina P.A. | Expert Damages Report, Deposition |
| Dec 2020 – March 2021 | *Snik LLC,* vs Samsung Electronics, et al. | 19-cv-387 | US District Court for the Eastern District of Texas | Settled | Patent Infringement | Kyle Harris LLP | Expert Damages Report |
| Oct 2021— | *Xat.com v. Hosting services, Inc.* | 190908649 | State Court - Utah | *Pending* | Contract / data breach / lost profits | Deiss Law, PC | Expert Damages Report |
| March 2021 – | L.A. Oliver vs *Meow Wolf et al.* | 20-cv-00237 | US District Court for the District of New Mexico | *Pending* | Copyright Infringement & Breach of Contract | Bardacke |Allison LLP | Expert Damages Report, Deposition |

HIGHLY CONFIDENTIAL – Attorney's Eyes Only

Kitsch LLC v. Deejayzoo LLC                        Expert Damages Report

June 22, 2022                                                  Page 24

# APPENDIX B

# DOCUMENTS AND SOURCES RELIED UPON

In the course of preparing this report, I relied upon the following list of principal documents and sources, as well as the documents and sources cited in the body of the report, including the footnote references.

1) Case Documents

   a. *Complaint For Declaratory Judgment And Demand For Jury Trial*, filed April 4, 2019. Including Exhibit 4.

   b. *Defendant's First Amended Counterclaims to First Amended Complaint for Declaratory Judgment and Demand for Jury Trial, filed June 3, 2020s*.

2) Documents Produced by Kitsch

   a. Original

      i. KITS049990-1 and KITS049995-6.

      ii. KITS04992-4

      iii. ProfitandLoss-2018 - HC – AEO.pdf

      iv. ProfitandLoss-2019 - HC – AEO.pdf

      v. Invoice Item Gross Profit Analysis Report by YEAR - HC – AEO.xlsx

   b. Updated

      i. Accused Shower Cap Profit Analysis Corrected-C

      ii. Accused Showercap Profit Analysis with Units-C

      iii. Reviewed but not relied upon:

         1. _Amazon Report-C

         2. _Shopify-C

         3. KITS010996 - HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

3) Documents Produced by Deejayzoo

   a. shhhowercap Financials_2019 and 2020.pdf

   b. Shhhowercap Monthly sales 2019 - Jul 2020-hardcoded.xlsx

4) Other documents or sources

   a. Deejayzoo's website: https://www.shhhowercap.com/

   b. Kitsch's website: https://mykitsch.com/

a. License agreement database: https://www.ktmine.com/

© IPmetrics, LLC – CONFIDENTIAL – Dissemination is subject to the Court's Protective Order

HIGHLY CONFIDENTIAL – Attorney's Eyes Only

**IPmetrics**
Intellectual Property Consulting

Kitsch LLC v. Deejayzoo LLC
June 22, 2022

Expert Damages Report
Page 25

# APPENDIX C

# COMPENSATION

IPMETRICS provides consulting services in connection with litigation support projects on a time and materials basis, and bills clients based on the number of hours worked. We have agreed to provide all work relating to this engagement according to the following rate schedule:

- Document Review, Research, Analysis & Report Writing      $450 / hour
- Deposition and Trial Testimony/Preparation      $450 / hour
- Non-working Travel      $175 / hour
- Administrative Support      $125 / hour

IPmetrics' compensation is not dependent, in any way, upon the conclusions reached during the performance of the analysis.

© IPmetrics, LLC – CONFIDENTIAL – Dissemination is subject to the Court's Protective Order

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 2818 La Cienega Avenue, Los Angeles, CA 90034.

A true and correct copy of the foregoing document entitled (*specify*): **OBJECTION BY KITSCH LLC TO DISCLOSURE STATEMENT FOR THE DEBTOR'S PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **January 12, 2026**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Kenneth Anand     kenneth@jayaramlaw.com
- Carly Everhardt   carly.everhardt@klgates.com
- Alla Kachan     alla@kachanlaw.com, 2759602420@filings.docketbird.com
- Bryan D Leinbach     bleinbach@zeklaw.com, 1990580420@filings.docketbird.com
- Office of the United States Trustee     USTPRegion02.BR.ECF@usdoj.gov
- Daniel H. Reiss     dhr@lnbyg.com
- Benjamin D Schwartz     bschwartz@norris-law.com, mberrios@norris-law.com
- Jay B Solomon     jsolomon@bbgllp.com

**2**. **SERVED BY UNITED STATES MAIL**: On (*date*) **January 12, 2026**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

None.

☐ Service information continued on attached page

**3**. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **January 12, 2026**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

None.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| January 12, 2026 | D. Woo | /s/ D. Woo |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |